*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0289P (6th Cir.)
File Name: 04a0289p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

AMERICAN TRIM, L.L.C.,
    *Plaintiff-Appellee,*

    *v.*

ORACLE CORPORATION,
    *Defendant-Appellant.*

No. 02-4186

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 99-07265—James G. Carr, District Judge.

Argued: April 21, 2004

Decided and Filed: September 1, 2004

Before: SUHRHEINRICH and GIBBONS, Circuit Judges;
LAWSON, District Judge.[*]

———————

## COUNSEL

**ARGUED:** James D. Thomas, SQUIRE, SANDERS & DEMPSEY, Cleveland, Ohio, for Appellant. James E. Burke

———————

[*] The Honorable David M. Lawson, United States District Judge for the Eastern District of Michigan, sitting by designation.

III, KEATING, MUETHING & KLEKAMP, Cincinnati, Ohio, for Appellee. **ON BRIEF:** James D. Thomas, Harris A. Senturia, SQUIRE, SANDERS & DEMPSEY, Cleveland, Ohio, Andrew L. Frey, MAYER, BROWN, ROWE & MAW, LLP, New York, New York, Robert L. Bronston, MAYER, BROWN, ROWE & MAW, Washington, D.C., Dorian Daley, Karen P. Scarr, ORACLE CORPORATION, Redwood City, California, for Appellant. James E. Burke III, Steven C. Coffaro, KEATING, MUETHING & KLEKAMP, Cincinnati, Ohio, for Appellee.

———————

## OPINION

———————

JULIA SMITH GIBBONS, Circuit Judge. Plaintiff-appellee American Trim, LLC ("American Trim") brought suit against defendant-appellant Oracle Corporation ("Oracle"), alleging claims of breach of contract, breach of express and implied warranties, negligent misrepresentation, and fraudulent inducement stemming from Oracle's sale of a software package to American Trim. Following a denial of Oracle's motion for partial summary judgment, the district court divided the case into three parts: In Phase I, the jury would decide the liability issues relating to American Trim's misrepresentation and fraud claims. If American Trim prevailed in Phase I, the jury would determine damages in Phase II. In Phase III, the jury would hear American Trim's breach of contract claims. After a trial on the merits, the jury found for American Trim in both Phase I and Phase II and awarded $3,000,000 in compensatory damages and $10,000,000 in punitive damages. American Trim then moved to voluntarily dismiss its contract claims under Federal Rule of Civil Procedure 41(a)(2). The district court granted this motion after construing it as a motion for leave to amend the complaint by deleting the contract claims. Oracle filed a motion for a new trial, or, in the alternative, remittitur, and a motion for judgment as a matter of law. The district court

denied these motions. Oracle appeals, arguing (1) the district court erred when it denied its motion for judgment as a matter of law on American Trim's fraud claims; (2) the district court abused its discretion by dividing the trial into three phases; (3) the compensatory damages were excessive; (4) Oracle was entitled to judgment as a matter of law on the issue of punitive damages; and (5) the ratio of punitive to compensatory damages violated due process. For the following reasons, we affirm the judgment of the district court.

## I.

American Trim was formed in 1996 as a joint venture between Alcoa, Inc., and Superior Metal Products, Inc.[1] It manufactures and sells component parts to automobile and appliance manufacturers, including Ford, General Motors, Whirlpool, and General Electric. These manufacturers require their suppliers, like American Trim, to process their orders electronically using Electronic Data Interchange ("EDI"). EDI enables companies to exchange information, such as orders and shipment status, between different computer systems (*e.g.*, between manufacturers and suppliers). Alcoa and Superior Metal Products both had separate EDI systems, but these systems could not communicate with each other, and the Superior Metal Products system was not Y2K compliant. In late 1996, American Trim began the process of acquiring an enterprise resource planning ("ERP") software system that would provide the integrated EDI technology American Trim needed. ERP software consists of numerous application programs that perform a broad variety of functions, such as financial accounting, human resources, payroll, manufacturing planning, and EDI.

---

[1] All facts are taken from the trial record unless otherwise noted.

Oracle is a supplier of business software. It licenses a suite of ERP software called "Oracle Applications." In the 1990s, Oracle worked with Radley Corporation, another software vendor, to offer EDI capabilities to automotive businesses. (Appellant's Br. at 5.) In 1996, Oracle initiated plans to develop software that would integrate Radley's EDI automotive software, CARaS ("Computer Aided Release Accounting System"), with Oracle ERP software in order to allow "automatic data exchange without the need for customized integration."

Hank Atwell, American Trim's manager of information systems ("I/S"), put together a list of twenty-five leading software vendors who were candidates to provide a new integrated system, and then narrowed that list down to six vendors, including Oracle. Craig Rogers, American Trim's EDI expert, testified that EDI was a "critical determinant" in including or eliminating participants in the selection process. According to Rogers, one of Oracle's competitors was eliminated from the process when it informed American Trim that it did not have the integrated EDI functionality American Trim was seeking.

In December 1996, an employee in American Trim's I/S department contacted Mike Vandivier, a sales representative for Oracle, and requested information about Oracle's manufacturing software and applications. She told Vandivier that American Trim wanted an integrated system with EDI capabilities. Vandivier did not know at that time whether Oracle could satisfy American Trim's needs, so he spoke with other people within the company, including Peter Ciccarelli, Oracle's sales manager for the mid-Atlantic region. Ciccarelli suggested to Vandivier that a product named Oracle Automotive might work for American Trim. He told Vandivier to try to get American Trim's representatives to come to a demonstration of the product in Detroit.

In March 1997, Oracle sent American Trim a "Statement of Direction," which described Oracle Automotive as "an

integrated supply chain management solution for . . . suppliers of the automotive industry." The Statement of Direction consistently describes Oracle Automotive in the present tense:

Oracle Automotive supports the key EDI transactions used within the automotive supply chain. Oracle EDI Gateway, Radley CARaS, and other transaction software, provide the necessary components to enable EDI transmission of automotive documents between trading partners.

However, the Statement of Direction also notes that:

The features listed in this statement of direction are planned for Beta release early in calendar Q1 1997 and are based on Oracle Applications Release 10.7 with Smartclient. Production release will be achieved as soon as successful Beta testing is completed.

In the software industry, "Beta release" refers to a stage of software development in which the software is released to a limited number of customers for testing and further development before being released to the general public. According to Oracle, Oracle Automotive entered Beta testing in June 1997. Vandivier testified that he was aware in spring 1997 that Oracle Automotive was limited in availability, but that Ciccarelli told him to proceed with his negotiations with American Trim because the product would be available by the time American Trim was ready to implement it.

When Atwell saw the reference to Beta testing in the Statement of Direction, he asked Oracle if he could see the software in use at a customer's site. Vandivier suggested instead that he attend a demonstration at Oracle's automotive center in Detroit because it would be too intrusive to go to a customer and he "didn't think [a customer] would give them a good show." Atwell testified that he made clear to Vandivier that American Trim would not be interested in

purchasing Oracle's software unless Oracle Automotive was included.

In March 1997, Atwell prepared a Request for Authorization ("RFA") for his plan to convert the company to new software. The RFA recommended the Oracle Applications system as the "best fit" for American Trim: "The Oracle Applications contain all of the software modules necessary to provide American Trim with a single integrated system. These software modules include Human Resources, Payroll, Manufacturing, Accounting, Sales & Marketing, Purchasing, & Quality."

American Trim sent its I/S group to Troy, Michigan on April 24, 1997, to see a live demonstration of Oracle Automotive. The purpose of attending the presentation was to see the EDI functionality operating before American Trim actually ordered it. Vandivier opened the presentation by telling the American Trim representatives that what they were going to see was "live" and "in production." During the presentation, Radley representatives demonstrated Radley CARaS and an Oracle representative demonstrated certain modules of Oracle Applications. Jim Butts of Oracle and John Walczy of Radley gave a slide presentation to illustrate the Oracle-Radley partnership. The slides, like the Statement of Direction, described Oracle Automotive in the present tense, as an existing integrated EDI product. The slides included (1) a statement that the Oracle Automotive Solution "fulfills" industry supply chain EDI requirements; (2) a depiction of the integrated flow of EDI transactions between Oracle Applications and the Radley CARaS software; and (3) statements that "Oracle Automotive is . . . [p]owerful capabilities [sic] through *two programs*" and that "Oracle supports, warrants & enhances the *complete* solution over time." (emphasis in original).

After the slide show, Butts conducted a demonstration showing the integrated flow of EDI transactions directly from the Radley CARaS component into the Oracle ERP

applications. Butts indicated to the American Trim I/S representatives that what they were seeing was actually happening and never advised that it was a simulation. Vandivier testified that, as a result of the presentation, he thought Oracle had functional EDI capability:

> Q: Okay. In terms of the functional EDI capability, though, you were under the impression that that functional EDI capability existed in April of '97.
> A. Yes. I saw it demonstrated along with the people from American Trim. Now, you know, quite bluntly, I don't know exactly what I saw, but I saw transactions going from a work station to the server and going through the Oracle system.
> Q. You certainly were under the impression it was actually operating, weren't you?
> A. Yes.

Butts later wrote in an email, "To be honest, if you were an American Trim person attending that demo, you would have believed that you were being sold an automotive solution."

After the Troy demonstration, Vandivier sent a proposed set of contract documents to American Trim, which included quotes for the software and for training. The proposals listed all of the Oracle ERP Applications that the parties had discussed, as well as Radley CARaS software, but they did not include Oracle Automotive. Atwell told Vandivier that he was not going to sign a contract that did not include Oracle Automotive and Vandivier told him he would give him one. Several American Trim representatives later testified at trial that they would not have entered into a contract with Oracle if Oracle Automotive had not been part of the agreement.

On August 22, 1997, American Trim entered into a Software License and Services Agreement ("the agreement") with Oracle. The agreement listed "Oracle Automotive CARaS" as one of the applications being sold to American Trim. Atwell later testified that at the time he thought

American Trim was purchasing Oracle Automotive because he thought the term was synonymous with "Oracle Automotive CARaS." Under the agreement, American Trim paid Oracle $1,263,613 in license fees, $284,734 in technical support fees, and $208,200 in training fees, for a total of $1,756,547. The agreement included an integration clause and provided for a 15-day "Acceptance Period" in which American Trim was allowed to cancel the licenses by giving written notice to Oracle and returning all of the programs.

Prior to delivery of the software, Atwell and Rogers attended an Oracle Applications User Group ("OAUG") Conference in Orlando. The conference materials advertised an "Automotive Process SIG" meeting, at which attendees would "hear an update regarding the Oracle Automotive solution status." Neither Atwell nor Rogers attended this meeting. During the conference, Oracle issued a press release stating that Oracle Automotive would become available with Oracle Applications Release 11. The record contains no evidence that this press release ever came to American Trim's attention.

American Trim took delivery of the software in October 1997. Oracle delivered twenty-five to thirty CDs, along with boxes of additional materials American Trim had not ordered. According to Atwell, "it looked like somebody went through the warehouse and picked up one of everything they had just to ship it." One of the CDs was labeled "Oracle Automotive 1.0.0.0.2 Beta."

The 15-day Acceptance Period expired on October 13. American Trim made no inquiry into the status of Oracle Automotive during that period, and it did not exercise its right to return the software. In December 1997, when American Trim started installing the Oracle software for training, it discovered that Oracle had shipped a different version of the applications software than American Trim had ordered. Oracle sent a consultant, Marion Zankowski, to help install the software they had received in time for American Trim's

in-house training that had been scheduled for the first week of January. Atwell asked Zankowski to install Oracle Automotive, but Zankowski told him that he was not authorized to install it because American Trim had received it in Beta format. Later that month, Rogers contacted Walczy to make preparations for training on Oracle Automotive and the CARaS EDI product. Walczy told him that Oracle Automotive was not available and would not be available until March 1998. Rogers later testified that he was "really shocked" at this news.

On February 10, 1998, Atwell met with Oracle employees David Synek and Mark Colburn and complained that American Trim had purchased Oracle Automotive, but had not received it. Colburn responded that American Trim could not have purchased Oracle Automotive because "it didn't exist." In a February 18, 1998 internal Oracle email detailing Atwell's complaints about the "automotive" solution, a regional sales manager for Oracle noted that American Trim "had purchased the Radley software along with the rest of our ERP suite – this is not at all unusual (as opposed to buying the complete 'Oracle Automotive Solution' which is a good story [but] is not much more than this as far as I know.)"

Despite what Colburn had told Rogers in January, Oracle Automotive was not ready in March 1998. Rogers testified that every month thereafter Oracle would promise that Oracle Automotive would be available the next month: "Sometimes they'd say we're just two weeks away from having it ready." In June 1998, American Trim still had not received Oracle Automotive, and Atwell complained to Colburn in an email: "I am up against deadlines, and so far all I get is promises and still no product (Oracle Automotive) that I can use."

On August 7, 1998, Atwell sent a letter to Oracle requesting a return of the $1,756,547 American Trim had paid for the Oracle Applications software, noting that "American Trim has tried to obtain the Oracle Automotive software without success since the contract was signed. This delay has caused

American Trim LLC to pursue other solutions to our Year 2000 issues, and as a result [we] can no longer utilize Oracle Applications software." In response, Butts and Oracle Vice President John Levey traveled to American Trim's office for a meeting on September 22, 1998. According to American Trim, the meeting became "hostile" and "contentious" when Butts denied that Oracle had ever sold Oracle Automotive to American Trim and accused it of fabricating the slides from the Troy presentation.

Levey followed up on the meeting by offering to pay two-thirds of the cost of having Oracle Consulting bring one of American Trim's plants up on the Oracle system. He estimated that American Trim would have to pay $99,000 for the one plant and $3.6 million for the whole company.[2] Atwell rejected it:

All the representations to American Trim, including the literature from Oracle, led us to believe that the Oracle software constituted an integrated, turn-key system. Your letter suggests to the contrary. Are we to understand that three months of consulting will only be the beginning? That we could expect as much as twice the license cost, or $3,400,000, in additional dollars in consulting fees? If that is the case, why was this not made known to us long ago and prior to ordering the Oracle system?[3]

---

[2] This figure was later adjusted to $4.4 million.

[3] Notably, Atwell's March 1997 RFA stated:

The cost of the Oracle Applications is $1,066,997. Oracle's suggested training and implementation costs approach $1,000,000, and include extensive use of outside consultants. The I/S Team feels that $250,000 will cover the training of the in-house Implementation Team and eliminate the need for the high-priced consultants, thus bringing the expertise inside American Trim.

In a follow-up letter, Levey outlined the reasons why American Trim was not having success with implementing "the Oracle solution": (1) American Trim underestimated the scope of the project; (2) American Trim "did not execute due diligence in ensuring that the order between American Trim, LLC and Oracle accurately and completely defined the details of the solution purchased according to . . . expectations. In fact, Oracle could have never committed to the terms currently voiced by Mr. Atwell"; (3) American Trim "underestimated the core Technical competencies needed to implement the solution purchased"; (4) American Trim "elected not to utilize consulting services to assist and/or manage implementing the project. The need to utilize consulting services on such a project is common knowledge within the industry"; and (5) American Trim "elected not to move forward on the Oracle software modules which do provide Year 2000 compliance, irrespective of integration with the Radley CARaS product."

At the end of 1998, American Trim upgraded its existing software to make it Y2K compliant and began converting the entire company to a newer version of a previously existing ERP system with integrated EDI capability. (Appellee's Br. at 20-21.)

In May 1999, American Trim brought suit against Oracle for fraud, negligent misrepresentation, breach of contract, and breach of warranty. Oracle filed a motion seeking partial summary judgment on American Trim's contract, warranty, intentional fraud, and punitive damages claims. At the outset, the district court determined that California law governed both the tort and contract claims. The court then bifurcated the tort claims from the contract claims and denied Oracle's motion for summary judgment with respect to the fraud claims, holding the motion for summary judgment with respect to the contract and punitive damages claims in abeyance pending trial on the merits. The trial was divided into three stages: In Phase I, the jury would consider the issue of Oracle's liability on the fraud and negligent

misrepresentation claims. If American Trim prevailed on any claim in Phase I, the jury would consider whether American Trim was entitled to damages on that claim in Phase II. If necessary, in Phase III the jury would consider breach of contract liability and damages.

Oracle objected to the district court's decision to divide the trial into three stages. It argued that the tort claims could not be separated from the contract claims because "[t]he fraud, breach of contract, and negligent misrepresentation claims are inextricably intertwined." The district court disagreed:

> I really think that there's not that much overlap, as I see it, between the issues that would be tried on the fraud and negligent misrepresentation because I think that's a pretty straightforward issue, was something called Oracle Automotive promised, and if so, was it delivered, and if not, that's the end of the fraud case and could potentially impact significantly on the contract claims.

The court justified the division of the trial in part because it had the potential to conserve judicial resources. "Whatever the outcome of the trial on the fraud and misrepresentation claims, the case may end once that trial is completed. If plaintiff prevails, the contract is a nullity. If plaintiff loses, Oracle may prevail on its pending motion for summary judgment as to its contract-based defenses."

Oracle filed a motion for reconsideration of the court's issue-separation rulings. It argued that the district court, subsequent to its initial order separating the trial into three phases, had changed its earlier ruling and stated for the first time that the element of causation would not be submitted to the jury in Phase I. Oracle claimed that it was entitled to present evidence relating to causation during a trial on liability for fraud and misrepresentation because causation is a "liability" issue and the district court's initial order stated that tort liability would be tried in Phase I. The district court denied the motion, noting that it had announced on July 23,

2001, that Phase I would consider only whether "something called Oracle Automotive was promised, and if so, was it delivered." The court also emphasized that its decision to limit Phase I in this way would not deprive Oracle of the opportunity to meet plaintiff's proof as to causation and that causation would still be addressed in Phase II: "Absent proof of causation, Plaintiff cannot prevail, even if Oracle deliberately deceived plaintiff as to one or more material facts."

Phase I took place from March 5-14. The court instructed the jury on American Trim's four theories of fraud under California law: false promise, intentional misrepresentation, concealment, and negligent misrepresentation. The jury found for American Trim on all issues.

After its deliberations in Phase II, the jury returned verdicts for American Trim and awarded $3 million in compensatory damages, plus $10 million in punitive damages.

American Trim then filed a motion under Federal Rule of Civil Procedure 41(a)(2) to voluntarily dismiss its claims for breach of contract, express warranties, and implied warranties. The district court granted the motion, construing it as a motion for leave to amend the complaint under Federal Rule of Civil Procedure 15(a), and dismissed American Trim's contract claims without prejudice.

Oracle filed motions for a new trial and remittitur, and a renewed motion for judgment as a matter of law. The district court denied these motions on September 12, 2002, and Oracle filed this timely appeal.

## II.

Oracle argues that (1) the district court erred when it denied its motion for judgment as a matter of law on American Trim's fraud claims; (2) the district court abused its discretion by dividing the trial into three phases; (3) the compensatory

damages were excessive; (4) it was entitled to judgment as a matter of law on the issue of punitive damages; and (5) the ratio of punitive to compensatory damages violated due process.

### A. Motion for Judgment as a Matter of Law on the Fraud Claims

Oracle argues that it was entitled to judgment as a matter of law on American Trim's fraud claims because American Trim's false promise claim is barred by the parol evidence rule and there was insufficient evidence to prove actual or justifiable reliance.

This court normally reviews the denial of a Rule 50(b) motion for judgment as a matter of law *de novo*, viewing the evidence in the light most favorable to the verdict. *Gray v. Toshiba Am. Consumer Prods., Inc.*, 263 F.3d 595, 598 (6th Cir. 2001). However, in a diversity case, when a Rule 50 motion for judgment as a matter of law is based on the sufficiency of the evidence, this court applies the standard of review of the state whose substantive law governs the matter. *Morales v. Am. Honda Motor Co.*, 151 F.3d 500, 506 (6th Cir. 1998). The district court determined that the substantive law of the state of California governs this action. Under California law, "[t]he trial court's discretion in granting a motion for judgment notwithstanding the verdict is severely limited." *Hansen v. Sunnyside Prods., Inc.*, 55 Cal. App. 4th 1497, 1510 (1997). When presented with such a motion, the court is not permitted to weigh the evidence, or to judge the credibility of witnesses. *Id.* A motion for judgment notwithstanding the verdict may be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support the verdict. *Id.* If the evidence is conflicting, or if several reasonable inferences may be drawn from the evidence, the motion should be denied. *Id.*

American Trim presented the jury with four different theories of fraud under California law: (1) Oracle falsely promised to deliver Oracle Automotive with no intention of doing so; (2) Oracle intentionally or (3) negligently misrepresented its ability to provide software with integrated EDI capability; and (4) Oracle concealed the fact that Oracle Automotive was not available. Oracle argues that the first theory, promissory fraud, is barred by California's parol evidence rule, and that with respect to the other three theories, American Trim failed to meet its burden of proving actual or justifiable reliance.

### 1.   The False Promise Claim and the Parol Evidence Rule

Oracle's first argument is that California's parol evidence rule prohibits enforcement of pre-contractual promises that contradict or vary the terms of an integrated written contract. The parol evidence rule is statutorily defined at California Civil Procedure Code § 1856(a). It provides that when the parties to a contract have set forth the terms of their agreement in a writing that they intend as the final and complete expression of their understanding, it is deemed integrated and may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement. *Banco Do Brasil v. Latian, Inc.*, 285 Cal. Rptr. 870, 885 (Cal. App. 1991). However, the parol evidence rule does not exclude evidence "to establish illegality or fraud." Cal. Civ. P. Code § 1856(g). This exception is limited in situations where a plaintiff is alleging a false promise: if "the false promise relates to the matter covered by the main agreement and contradicts or varies the terms thereof, any evidence of the false promise directly violates the parol evidence rule and is inadmissible." *Banco Do Brasil*, 285 Cal. Rptr. at 892 (internal quotes omitted).

Oracle contends that American Trim's false promise claim is barred by the parol evidence rule because the contract in this case "unambiguously specifies the functionality of the

licensed software" and specifically "disclaim[s] any functionality aside from that described in the documentation accompanying the licensed software." As American Trim notes, however, the parol evidence rule does not apply here because its false promise claim is based on Oracle's promises, contained in the agreement itself, to deliver Oracle Automotive. The agreement specifies that "Oracle Automotive CARaS" was being delivered, and Atwell testified that he took that term to be another name for the product with EDI functionality that had been demonstrated in Detroit. Testimony as to the meaning of the term "Oracle Automotive CARaS" was not barred by the parol evidence rule because it was "relevant to prove a meaning to which the language of the instrument [was] reasonably susceptible." *See Delta Dynamics, Inc. v. Arioto*, 72 Cal. Rptr. 785, 787 (Cal. 1968). American Trim's false promise claim was that Oracle promised to provide "Oracle Automotive CARaS" when it entered into the agreement, that "Oracle Automotive CARaS" referred to the integrated EDI product it was seeking, and that Oracle failed to provide that product as promised in the agreement. This claim does not contradict or vary the terms of a prior written contract because "Oracle Automotive CARaS" is not defined anywhere in the agreement. American Trim's false promise claim therefore is not barred by the parol evidence rule.

### 2.   Actual and Justifiable Reliance

Oracle next argues that American Trim produced insufficient evidence of its actual and justifiable reliance. It contends that American Trim failed to meet its burden of showing that it believed Oracle Automotive was in production release and entered into the agreement on that basis.

Actual and justifiable reliance are elements of each of American Trim's fraud claims. *See Firoozye v. Earthlink Network*, 153 F. Supp. 2d 1115, 1128 (N.D. Cal. 2001); *Kremen v. Cohen*, 99 F. Supp. 2d 1168, 1175 (N.D. Cal. 2000); *Tarmann v. State Farm Mut. Auto. Ins. Co.*, 2 Cal.

Rptr. 2d 861, 863-64 (Cal. App. 1991). Actual reliance occurs when a misrepresentation is an immediate cause of a plaintiff's conduct, which alters his legal relations, and when, absent such representation, he would not, in all reasonable probability, have entered into the contract or other transaction. *Engalla v. Permanente Med. Group, Inc.*, 15 Cal. 4th 951, 976 (1997). Actual reliance must also be justifiable, *i.e.*, reasonable. *Wilhelm v. Pray, Price, Williams & Russell*, 231 Cal. Rptr. 355, 358 (Cal. Ct. App. 1986).

In this case there was substantial evidence to support the jury's conclusion that American Trim actually and justifiably relied on Oracle's misrepresentations that Oracle Automotive was available for purchase and entered into the agreement on that basis. Several American Trim employees testified that American Trim would not have entered into the contract with Oracle were it not for Oracle's representations about Oracle Automotive's availability. Oracle argues that Atwell's testimony demonstrates that there was no actual reliance because he stated that he "wasn't really concerned" whether Oracle Automotive was in pre-production (Beta) release and that Oracle Automotive was "not a major issue" as late as January 20, 1998. There is a substantial difference between being concerned about whether Oracle Automotive was in Beta release and whether it was in release *at all*. Furthermore, the level of concern Atwell displayed upon learning of Oracle's fraud after the contract was signed is not relevant to the issue of whether American Trim actually relied on the misrepresentation when it entered into the agreement, and in any case, at the time when Atwell said that Oracle Automotive was "not a major issue," Oracle was still promising that it was going to deliver the product in March 1998. Butts's own testimony demonstrates that American Trim's reliance on Oracle's representations at the Troy presentation was reasonable: "To be honest, if you were an American Trim person attending the demo, you would have believed you were being sold an automotive solution."

### B.  The District Court's Decision to Divide the Trial into Three Phases

Oracle contends that the district court's procedural and associated evidentiary rulings caused it to suffer "substantial prejudice." In particular, it argues that the district court's separation of the fraud and contract claims deprived it of the opportunity to present a meaningful defense. Oracle's "theory of the case" was that American Trim knew the actual status of Oracle Automotive at the time it bound itself to the agreement, and that, even if it did not, the current availability of Oracle Automotive was immaterial to its purchase decision. According to Oracle, Atwell understood, no later than the delivery to American Trim of a Beta version during the acceptance period, that Oracle Automotive remained under development. "Atwell nevertheless decided to continue with the project to install Release 11 (with the Oracle Automotive functionality) when it became available, since American Trim had no need for immediate availability of Oracle Automotive."

Federal Rule of Civil Procedure 42(b) allows a district court to "separate trial of any claim . . . or of any separate issue" to promote convenience and economy or to avoid prejudice. A district court's decision to do so is within its sound discretion and "will be affirmed unless the potential for prejudice to the parties is such as to clearly demonstrate an abuse of discretion." *In re Bendectin Litig.*, 857 F.2d 290, 308 (6th Cir. 1988).

Contrary to Oracle's contention, a review of the record in this case indicates that it had every opportunity to present all relevant arguments in Phases I and II of the trial. For instance, Oracle conducted an extensive cross-examination of Atwell in which he stated that Oracle Automotive was "not a major issue" in January 1998. Oracle introduced evidence that (1) Atwell was told he needed to spend money on consultants but did not; (2) Atwell failed to complain when he received the Beta version of Oracle Automotive; (3) Atwell

did not raise the issue of the missing integration piece until February 1998; and (4) Atwell's job was in jeopardy in July 1998 because he did not have Oracle Automotive. At closing argument in Phase I, counsel for Oracle told the jury: "You also see from their own documents what we told them. We told them that you also need a consultant. You heard Mr. Atwell say, we didn't spend money on a consultant. . . . Mr. Atwell claims that he wanted something called Oracle Automotive and that he understood from the demonstration in Troy it was live and real. When it's delivered in September of 1997, if you believe his testimony, and you see Oracle Automotive beta, what do you do? That's when you claim fraud."

Oracle also argues that the district court's separation of the issue of causation from Phase I prejudiced its ability to present its defense that American Trim had not acted in reliance upon its alleged false representations when it entered into the agreement. Oracle confuses the issue of whether the representation was the cause of American Trim's conduct in entering into the transaction, which was in fact discussed in detail in Phase I, with the issue of whether Oracle's misrepresentation caused American Trim to suffer any damages, which was at issue in Phase II. In Phase I, the jury heard testimony from numerous witnesses that American Trim would not have entered into the contract if it had known at the time that Oracle Automotive was not in fact available. The trial structure did not require the jury to decide an identical question in each of the first two phases of the case, as Oracle contends. Moreover, the tort and contract claims were not the same and were properly divided. As the district court noted,

> Fraud and breach of contract (and defenses related to the claim of breach of contract) are distinct claims: one relates to the contract's formation, while the other relates to its performance, and fraud in a contract's formation can defeat its enforceability. Likewise, whether a false promise was intentionally made and relied on are distinct

issues from the question of whether an intentionally false promise caused harm, and, if so, the amount of such harm.

The court did not abuse its discretion when it divided the trial into three separate phases. Oracle was given an opportunity to present fully its "theory of the case" with respect to the fraud claims, and the jury rejected it. The district court's separation of issues caused no prejudice to Oracle.

## C. Compensatory Damages

Oracle next argues that the compensatory damage award of $3 million "exceeds the maximum that a jury could reasonably find to be compensatory for the plaintiff's loss," and that the district court erred by failing to grant a new trial or remit the award "to the maximum supportable level."

As a general rule, this court has held that "a jury verdict will not be set aside or reduced as excessive unless it is beyond the maximum damages that the jury reasonably could find to be compensatory for a party's loss." *Farber v. Massillon Bd. of Educ.*, 917 F.2d 1391, 1395 (6th Cir. 1990). A trial court is within its discretion in remitting a verdict only when, after reviewing all the evidence in the light most favorable to the prevailing party, it is convinced that the verdict is clearly excessive; resulted from passion, bias, or prejudice; or is so excessive or inadequate as to shock the conscience of the court. *Id.* If there is any credible evidence to support a verdict, it should not be set aside. *Id.*

In Phase II, Oracle presented the jury with the following summary of its damages:

| Cost of Oracle System | $1,849,447.00 |
|---|---|
| Training and Implementation Costs for Oracle System | $32,744.09 |
| Cost of Renewing MDSS License | $72,000 |
| Prejudgment Interest | |
| @ 6% | $581,914.93 |
| @ 7% | $691,275.75 |
| *Total* (with 6% interest) | $2,536,106.02 |
| *Total* (with 7% interest) | $2,645,466.84 |

American Trim's witnesses also testified about additional damages not itemized in the above summary, including: approximately $140,000 in wages and related expenses in connection with the employee hours American Trim employees spent training on Oracle software and $50,000 of microcomputer equipment American Trim had upgraded specifically to work with Oracle software. Additionally, American Trim's treasurer, Dana Morgan, testified that he took a "conservative" approach to calculating their compensatory damages. American Trim also introduced testimony about its "intangible losses" caused by the amount of wasted time and effort it expended on Oracle, including testimony from Rogers that American Trim had "lost a year-and-a-half in a critical, important project" and that time was "as important as money."

The district court concluded that there was an adequate evidentiary basis for the compensatory damage award, and we agree. There is at least some credible evidence to support the jury's $3,000,000 verdict. Therefore, the district court did not abuse its discretion when it refused Oracle's request to set it aside or reduce it as excessive.

**D.  Motion for Judgment as a Matter of Law on Punitive Damages**

Oracle also contends that American Trim failed to meet its burden of proof on its claim for punitive damages. In particular, it argues that American Trim failed to prove by clear and convincing evidence that Peter Ciccarelli was a managing agent who authorized or ratified the fraud against it.

In order to hold a corporation liable for punitive damages based on fraud under § 3294(b) of the California Civil Code, a plaintiff must show by clear and convincing evidence that an officer, director or manager authorized or ratified the fraud. Cal. Civ. Code § 3294(b). An agent or employee acts in a managerial capacity whenever the degree of discretion permitted the agent or employee in making decisions is such that the agent or employee's decisions will ultimately determine the corporation's business policy. *Mitchell v. Keith*, 752 F.2d 385, 390 (9th Cir. 1985) (quoting *Egan v. Mut. of Omaha Ins. Co.*, 620 P.2d 141, 148 (Cal. 1979)). In order to demonstrate that an employee is a true managing agent under § 3294(b), a plaintiff seeking punitive damages must show that the employee exercised substantial discretionary authority over significant aspects of a corporation's business. *White v. Ultramar, Inc.*, 981 P.2d 944, 951 (Cal. 1999). The critical inquiry is the degree of discretion the employee has in making decisions that will determine corporate policy, not the employee's particular level in the corporate hierarchy. *Egan*, 620 P.2d at 149.

In this case, there was sufficient evidence for the jury to find both that Ciccarelli was a managing agent for Oracle and that he authorized or ratified the fraud against American Trim. As Oracle's Application Sales Director for the mid-Atlantic region, Ciccarelli had a sales quota of $70,000,000. He was responsible for fifty employees, including all the sales representatives in his region and their supervisors. *See White*, 981 P.2d at 954 (holding that a zone manager responsible for supervising eight retail stores and sixty-five employees who had "substantial discretionary authority over vital aspects" of the corporation's business, including "managing numerous stores on a daily basis, and making significant decisions affecting both store and company policy," was a managing agent). Oracle's 2000 annual report described the company as a "feudal operation" run by a group of autonomous general managers, who set their own prices, invented their own policies and procedures, and ran their own computer systems. Although this section of the annual report describes the responsibilities of the managers responsible for sales in entire countries, the district court concluded that the jury was entitled to infer from this evidence that it was an accurate portrayal of the kind of authority given to a sales manager responsible for only a large segment of a country. Ciccarelli himself testified that he was "authorized to determine and agree to and approve what solutions [Oracle] would present to [its] customers to solve their business problems." It is worth noting that California does not require evidence that a purported managing agent was responsible for setting firm-wide or official policy. *See White*, 981 P.2d at 956 (Mosk, J., concurring) (noting that while supervisor "lacked the authority to terminate plaintiff without approval of [the corporation's] human resources and division manager" and had no authority to set firm-wide or official policy, she exercised the authority that necessarily resulted in the "ad hoc formulation of policy" that adversely affected the plaintiff, and was therefore a managing agent).

With respect to whether Ciccarelli ratified or authorized the fraud committed by Oracle, the record clearly indicates that

Ciccarelli told Vandivier to offer Oracle Automotive to American Trim even though he knew that it was not yet available. He also testified that he did not know that his sales team misrepresented the functionality of Oracle Automotive or that American Trim believed his sales team. Oracle notes that "[c]orporate ratification in the punitive damages context requires actual knowledge of the conduct and its outrageous nature." *Coll. Hosp., Inc. v. Superior Court*, 34 Cal. Rptr. 2d 898, 912 (Cal. 1994). However, nothing in the case law Oracle has cited indicates that Ciccarelli had to have actual knowledge that American Trim was in fact deceived by the deception he authorized when he told Vandivier to offer Oracle Automotive before it was in production.

Viewing the evidence in the light most favorable to American Trim, there was clear and convincing evidence in the record to support the jury's finding that Ciccarelli was a managing agent for Oracle and that he ratified the acts of his subordinates.

### E.   The Ratio of Punitive to Compensatory Damages

Finally, Oracle argues that the punitive damages award is unconstitutionally excessive under the Due Process Clause of the Fourteenth Amendment. This argument was raised for the first time in Oracle's reply brief, and this court has consistently held that we will not consider such arguments. *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 578 (6th Cir. 2002). Oracle contends that this "general" rule is not to be applied "where doing so would result in a miscarriage of justice." As American Trim notes, that language is from a different rule of this court, *i.e.*, that we will not consider arguments raised for the first time on appeal unless doing so would "result in a plain miscarriage of justice." *Id.* at 578. Oracle actually raised the argument that the punitive damages award was unconstitutional before the district court, but chose not to include it in its 67-page opening brief. Oracle argues that its failure to challenge the constitutionality of the punitive damages award is excused

because the Supreme Court filed its decision in *State Farm Mutual Auto Insurance Co. v. Campbell*, 538 U.S. 408 (2003), seven weeks after its opening brief was due. According to Oracle, *State Farm* was "an intervening change in the law subsequent to the filing" of its opening brief that excused its initial failure to raise the constitutional argument. However, *State Farm* did not work a change in the law so much as it clarified existing law set forth in *BMW of North America v. Gore*, 517 U.S. 559 (1996).

Due process prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor. *State Farm*, 538 U.S. at 416. In *Gore*, the Supreme Court instructed courts reviewing punitive damages awards to consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. 517 U.S. at 575. *State Farm* did not change these factors, and in fact, the court analyzed the constitutionality of the punitive damages award at issue in that case using those same three guideposts. 538 U.S. at 418-29. Counsel for Oracle was familiar with *Gore*'s guideposts long before the outcome in *State Farm* was decided. Indeed, counsel challenged the constitutionality of the punitive damages award before the district court. Oracle waived its right to assert the same argument on appeal by raising it for the first time in its reply brief.[4]

---

[4]In *State Farm*, the Court noted that "single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution." 538 U.S. at 425. We note that the 3.3-to-1 ratio in this case is single-digit and less than the 4-to-1 ratio cited in *Gore*. 517 U.S. at 581. California courts have also upheld similar ratios since *State Farm* was decided. *See, e.g., Romo v. Ford Motor Co.*, 6 Cal. Rptr. 3d 793, 813 (Cal. Ct. App. 2003) (upholding a punitive-to-compensatory damage award ratio of 5-to-1).

### III.

For the foregoing reasons, we affirm the judgment of the district court.