**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 05a0094n.06
Filed: February 8, 2005

**No. 04-3069**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| LARRY E. DAVENPORT, M.D., | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | **PETITION FOR REVIEW FROM THE** |
| UNITED STATES DEPARTMENT OF JUSTICE, | ) | **UNITED STATES DEPARTMENT OF JUSTICE, DRUG ENFORCEMENT** |
| | ) | **ADMINISTRATION** |
| Respondent. | ) | |
| | ) | |
| | ) | |

**Before: GIBBONS and ROGERS, Circuit Judges, and BELL, District Judge.**[*]

**JULIA SMITH GIBBONS, Circuit Judge**. On September 21, 2001, the United States Department of Justice, Drug Enforcement Administration ("DEA") issued an order to show cause proposing to deny an application submitted by Larry E. Davenport, M.D. for registration as a practitioner to dispense controlled substances pursuant to 21 U.S.C. § 823(f), for the reason that Davenport's registration would be inconsistent with the public interest. Davenport requested a hearing, which was held in Knoxville, Tennessee on August 28 and 29, 2002, before an administrative law judge ("ALJ"). The ALJ found that the government had met its burden of proof for denial of Davenport's application for a DEA certificate of registration, but recommended that

---

[*]The Honorable Robert Holmes Bell, Chief United States District Judge for the Western District of Michigan, sitting by designation.

the DEA certificate of registration be granted to Davenport with restrictions and DEA oversight.

On December 18, 2003, the DEA issued its final order. The Deputy Administrator, after reviewing

the entire record, did not adopt the ALJ's decision. The Deputy Administrator found that granting

Davenport's application for a DEA certificate of registration was inconsistent with the public

interest and therefore denied Davenport's application. Davenport filed a timely petition for review

to this court on January 16, 2004.

For the following reasons, we affirm the Deputy Administrator's final order denying

Davenport's application for a DEA certificate of registration.

**I.**

After completion of his medical education, Dr. Larry Davenport worked as an emergency

room physician for two years before opening the MediCenter, a walk-in clinic in Pigeon Forge,

Tennessee in July 1991. Davenport hired other physicians as well as support staff for this office.

Davenport first obtained a certificate of registration from the DEA on July 25, 1989. This certificate

was renewed on May 25, 1995, and expired on June 30, 1998. Davenport submitted a new

application for registration with the DEA on January 10, 2000. Davenport ended his work at the

MediCenter in April 2002.

In October 1998, the Division of Tennessee Health Related Boards received a complaint that

Davenport was using Demerol, a Schedule II controlled substance pursuant to 21 C.F.R. §

1308.12(c)(18), while seeing patients. Marianne Cheaves, a former investigator for the Tennessee

Health Related Boards, Office of Investigations,[1] and Rhonda Phillips, a diversion investigator with the Drug Enforcement Administration, became involved in the investigation of Davenport to determine whether Davenport was in fact abusing Demerol, as well as to investigate other possible instances of misconduct in Davenport's dealings with controlled substances. The investigation involved interviewing several physicians and support staff that worked with Davenport, interviewing Dr. Kris Houser,[2] and conducting an audit of the Demerol ordered and dispensed by the MediCenter between November 12, 1997, and October 6, 1998. This investigation revealed that there were 10,100 milligrams of Demerol ordered for which the MediCenter could not account.

Also in connection with the investigation, Pam Runyon-Dean, a certified medical assistant at the MediCenter, began to keep a journal of the daily activities at the MediCenter. Runyon-Dean's journal entries documented several noteworthy occurrences. First, Runyon-Dean noted that she had provided Davenport with tuberculin syringes at his request so that he could administer allergy shots to his daughter at home. However, when Runyon-Dean mentioned the request to the MediCenter office manager, she claims that the manager told her that Davenport's daughter did not take allergy shots. Second, on several occasions, Runyon-Dean noted that Davenport appeared groggy and sleepy with glassy eyes. Davenport claimed that many of the instances in which he appeared groggy

---

[1]The Tennessee Health Related Boards, Office of Investigations is the office within the Tennessee Department of Health responsible for conducting investigations of complaints regarding the unprofessional performance or conduct of health care practitioners within the state.

[2]Davenport has been treated by Dr. Houser, a psychiatrist who practices in Tennessee, for Attention Deficit Hyperactivity Disorder ("ADHD"), insomnia and severe obstructive sleep disorder, and tension headaches. Davenport currently takes Xanax for his ADHD, Ambien and Halcion with an extra dose of Xanax for his sleeping ailments, and an anti-inflammatory medication, a muscle relaxant, and hydrocodone for his tension headaches.

and sluggish were a result of the medications he took for his various medical conditions, rather than a result of a Demerol abuse problem. Runyon-Dean further observed on several occasions that Davenport spent a lot of time in the bathroom, and frequently after he came out, she noticed blood spots on tissues in the trash, on various fixtures in the employee bathroom, and, occasionally, on Davenport's clothing. Runyon-Dean also noticed a syringe wrapper in a previously empty bathroom trash can on one occasion. Runyon-Dean noted that during the course of one particular day, the office bottle of Demerol periodically disappeared and reappeared from the office safe throughout the day. Runyon-Dean further noted that the times when the Demerol was missing corresponded with Davenport's trips to the bathroom. On one occasion, a female patient of Davenport saw him enter the bathroom with a syringe and emerge with blood and a bandage on his arm. The patient also observed Davenport holding a bloody tissue to his arm. When the patient asked Davenport why he was bleeding, he told her that an office employee had drawn his blood to check his cholesterol level. Runyon-Dean claims she asked the office employee whether he had drawn any blood from Davenport that day, to which question the office employee had responded negatively.

Davenport denied ever abusing Demerol at the office. He stated that because Demerol had disappeared from the office on occasion, he removed it from the clinic. Davenport also stated that he had undergone two substance abuse evaluations in 1995, prior to the investigations at issue in this case, in response to allegations that he was abusing medications, and both evaluations showed that he did not abuse any substance.

Several physicians stated in affidavits or other writings that they did not authorize various prescriptions for Davenport that were made in their names. Another physician reported to the FBI that he believed that Davenport had called a pharmacy pretending to be that physician and asked the

pharmacy to post-date a chart for another physician's wife to make it appear that a given prescription was medically necessary. Dr. Houser, Davenport's treating physician, signed a witnessed letter stating that some of the prescriptions for Davenport in Dr. Houser's name were made in greater quantities than Dr. Houser would as a general rule prescribe. A pharmacist also submitted a witnessed writing stating that Davenport called in prescriptions to a local pharmacy with the request that a different doctor's name be placed on the prescription label.

Runyon-Dean also identified physicians at the hearing in whose names Davenport called in prescriptions. Runyon-Dean claimed that she heard Davenport call in prescriptions and tell the pharmacist to put the prescription under the name of a different physician. Davenport explained that he never attempted to call in prescriptions under another physician's name without the physician's authorization. He explained these occurrences by stating that he generally called in the prescription to a medical technician at the MediCenter and asked the technician to contact other physicians to obtain their authorization. Davenport inferred that the medical technician must have failed to get the appropriate physician's approval, despite Davenport's admonitions to do so.

Davenport acknowledged that he became aware in November 1998 that his DEA certificate had expired. Nonetheless, the record contains information showing that Davenport wrote prescriptions for controlled substances after this date. Davenport testified at the hearing that he stopped writing controlled substance prescriptions after he became aware that his DEA certificate had expired. Davenport acknowledged the fact that controlled substance prescriptions were called in under his name even after the time that he admitted knowing his DEA certificate had expired, but he surmised that these prescriptions were mostly refills. He also stated that he did call in a

prescription for Lomotil, an anti-diarrheal medication, after he learned of his certificate's expiration, but at the time, he was unaware that Lomotil is a controlled substance.

On August 7, 2000, the Tennessee Board of Medical Examiners[3] ("the Board") issued a notice of charges and memorandum of assessment of civil penalty to Davenport. This notice of charges was amended on August 10, 2000. The notice of charges was based on the following allegations: (1) Davenport wrote at least sixteen prescriptions for controlled substances after his DEA certificate had expired, and (2) Davenport, both before and after his certificate had expired, prescribed at least thirty-three controlled substances for himself and at least twenty-nine prescriptions for his wife using another physician's name or DEA certificate number without the physician's knowledge or approval. The Board asserted that the factual allegations were sufficient to establish violations of three provisions of the Tennessee Medical Practice Act, Tenn. Code Ann. § 63-6-101 *et seq.*

Davenport and the Board entered into an agreed order on January 24, 2001. The agreed order found that (1) Davenport negligently wrote eight prescriptions for controlled substances after the expiration of his DEA certification, and (2) Davenport intentionally or negligently failed to obtain permission from physicians before obtaining fourteen prescriptions for himself and twenty-seven prescriptions for his wife using another physician's name and DEA number. The amended

---

[3]The Tennessee Board of Medical Examiners is a Division of the Tennessee Health Related Boards responsible for issuing and regulating the licenses of qualified physicians within the state. The Board investigates individuals who have allegedly violated the Tennessee Medical Practice Act and disciplines individuals found guilty of violations through written reprimands, suspensions, and license revocations.

order held that these actions were sufficient to establish a violation of Tenn. Code Ann. § 63-6-214(b)(1), which prohibits unprofessional, dishonorable, or unethical conduct.

The agreed order suspended Davenport's license for three months followed by a two year probationary period. Davenport was also required to attend a three-day course on prescribing controlled drugs and a medical ethics course and pay $4,900 in civil penalties.

On September 21, 2001, the DEA issued an order to show cause to Davenport, seeking to deny his application for a DEA certificate of registration as a practitioner submitted on January 3, 2000, under 21 U.S.C. § 823(f), because granting his application would be inconsistent with the public interest. The order to show cause cited as evidence of this contention the following allegations and occurrences: (1) the Tennessee Department of Health investigation revealed that Davenport had telephoned in prescriptions for himself and his wife under the names and DEA numbers of several physicians without their authorization; (2) the investigation revealed that Davenport took controlled substances, including Demerol, from his office for his own personal use; (3) Davenport called in a prescription for Vicodin for his wife, pretending to be another physician and asked the physician when he became aware of the actions to post-date his wife's patient chart; (4) Davenport issued at least eleven prescriptions under Davenport's authorization after his certificate had expired; and (5) the Tennessee Board of Medical Examiner's disciplinary actions against Davenport, pursuant to the agreed order. Davenport timely filed a request for a hearing on the order to show cause on October 19, 2001. The hearing was held in Knoxville, Tennessee, on August 28 and 29, 2002. The government produced three witnesses (Runyon-Dean, Cheaves, and Phillips) as well as documentary evidence. Davenport was the only witness to testify on his behalf.

Following the hearing, the ALJ weighed the five factors set forth in 21 U.S.C. § 823(f) used to determine whether the issuance of a certificate would be against the public interest: (1) the recommendation of the state licensing board or professional disciplinary committee; (2) the applicant's experience in dispensing controlled substances; (3) any conviction against the applicant under federal or state law for illegal manufacture, distribution, or dispensing of controlled substances; (4) compliance with state and federal law regarding controlled substances; and (5) other conduct which would threaten the public health or safety.

With respect to the first factor, the ALJ noted that the agreed order issued by the Tennessee Board of Medical Examiners did not limit Davenport's ability to handle controlled substances after the reinstatement of his license, despite the fact that the Board had found that Davenport was prescribing himself and his wife medication under other physician's names without their authorization. The ALJ also noted that the Board's suspension of Davenport's license was relatively brief. The ALJ found that these actions by the Board arguably reflected favorably on Davenport, as they indicated that the Board felt that Davenport was not a danger to the public safety or health.

With respect to the second and fourth factors, dealing with Davenport's experience with dispensing controlled substances as well as his compliance with federal and state laws relating to controlled substances, the ALJ found that Davenport had displayed a "serious lack of attention," based on the fact that he failed to renew his DEA certificate when it expired, continued to prescribe controlled substances after the expiration of his certificate, caused prescriptions to be issued for himself and his wife without proper physician authorization, and failed to account for a significant amount of Demerol that had been ordered for office use. The ALJ found Davenport's testimony stating that these actions were unintentional to be credible, but nonetheless found such negligence

on Davenport's part "troubling." The ALJ concluded that Davenport's "past conduct in prescribing controlled substances without federal authority and in failing to pay attention to his DEA registration[] provides strong evidence in support of denial of his pending application." However, the ALJ did credit Davenport's assumption of responsibility and strong desire to attain DEA registration to be "strong and credible indicators" that he would be able to handle DEA registration with DEA oversight.

With respect to factor five, any other conduct that would threaten the public safety, the ALJ found that though Davenport had failed to establish a protocol for call-in prescriptions by office staff, Davenport's assumption of responsibility and willingness to modify his behavior indicated that he would benefit from DEA oversight of his future dealings with controlled substances. The ALJ also found that the government had failed to establish that Davenport was using Demerol for his own personal use. Despite finding Runyon-Dean to be a credible witness, the ALJ relied on the fact that, in two past evaluations, Davenport had not been found to have any substance abuse problems to conclude that the government had not produced sufficient evidence on this point.

Ultimately, the ALJ found that the government had met its burden of proof for denial of Davenport's application for a DEA certificate of registration. Notwithstanding this fact, the ALJ recommended that Davenport be issued a DEA certificate of registration subject to several restrictions and conditions.

On December 18, 2003, the Deputy Administrator for the DEA published a final order regarding Davenport's DEA application. In this final order, the Deputy Administrator chose not to adopt the findings of fact, conclusions of law, and decision of the ALJ. Instead, the Deputy Administrator denied Davenport's application for a DEA certificate of registration based on a

finding that Davenport's registration would be inconsistent with the public interest. In so finding, the Deputy Administrator, upon review of the record, found that there was substantial evidence in the record to support a finding that Davenport was diverting Demerol for his own personal use. In reaching this conclusion, the Deputy Administrator relied heavily on the testimony of Runyon-Dean regarding her observations of Davenport's behavior at the office. The Deputy Administrator further found that the government "adduced plentiful evidence" that Davenport was calling in prescriptions for himself and his family using the names of other physicians without their authorization. The Deputy Administrator relied on Davenport's admission in the Tennessee Board's agreed order that he had issued forty-one prescriptions for himself and his wife under the names of other physicians, as well as the testimony elicited from the physicians, Runyon-Dean, and Phillips at the hearing in reaching this conclusion. Finally, the Deputy Administrator found that the government had produced evidence that Davenport had continued to call in prescriptions under his own name after his DEA certificate had expired. The Deputy Administrator weighed these factual findings utilizing the five factors set forth in 21 U.S.C. § 823(f) and concluded that it would not be in the public interest to grant Davenport's application for DEA registration.[4]

**II.**

---

[4]In the final order denying Davenport's application, the Deputy Administrator cited 21 U.S.C. § 823(f), but proceeded to recite instead the five factors to be considered when reviewing an application under 21 U.S.C. § 823(h). However, Davenport's opening brief did not challenge the Deputy Administrator's decision on this ground, and we therefore do not consider it as a basis for reversal. *See Am. Trim, LLC v. Oracle Corp.*, 383 F.3d 462, 477-78 (6th Cir. 2004); *Priddy v. Edelman*, 883 F.2d 438, 446 (6th Cir. 1989).

This court must accept the DEA's findings of facts as conclusive, provided that they are supported by substantial evidence. 21 U.S.C. § 877. Substantial evidence exists when, on the record as a whole, evidence is "adequate, in a reasonable mind, to uphold the [DEA's] decision." *Turnbull Cone Baking Co. v. NLRB*, 778 F.2d 292, 295 (6th Cir. 1985). This court must uphold the DEA's decision if supported by substantial evidence even if this court would have made a different choice had the matter been before the court *de novo*. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).

The Deputy Administrator is empowered to deny an application for a DEA certificate of registration to dispense controlled substances pursuant to 21 U.S.C. § 823(f) where the issuance of such a certificate would be inconsistent with the public interest. The government bears the burden of showing that the issuance of the certificate is not in the public interest. *Shatz v. DOJ*, 873 F.2d 1089, 1091 (8th Cir. 1989).

Davenport asserts on appeal that there was not substantial evidence in the record to support the Deputy Administrator's finding that Davenport was diverting Demerol from the office for his own personal use. In so arguing, Davenport asserts that Runyon-Dean, the main source of the evidence in the record supporting the Deputy Administrator's finding, is not credible. Additionally, Davenport stresses his own testimony in the record in an attempt to rebut Runyon-Dean's observations.

The ALJ found that there was not enough evidence to support a finding that Davenport was abusing Demerol. However, upon review of the record, the Deputy Administrator found that there was indeed enough evidence in the record to support a finding that Davenport was abusing Demerol at the office. In reaching this determination, the Deputy Administrator relied heavily on the

- 11 -

testimony and documentary evidence produced by Runyon-Dean regarding her observations of Davenport's behavior and the frequent appearance of blood in the bathroom and on Davenport's person following his emergence from the employee bathroom. The ALJ explicitly found Runyon-Dean to be a credible witness, but did not afford as much weight or explore in as great detail Runyon-Dean's testimony as did the Deputy Administrator. The Deputy Administrator also relied on the fact that 10,100 milligrams of Demerol could not be accounted for during Cheaves's audit, a fact that is undisputed by Davenport. The Deputy Administrator's finding that Davenport abused Demerol thoroughly discusses the evidence in the record that supports this conclusion. We therefore hold that this finding was supported by substantial evidence and affirm the final order on this ground.        Davenport argues next on appeal that substantial evidence does not exist in the record to support a finding that Davenport intentionally (1) caused prescriptions to be issued for himself and his family members under the names of other physicians without their authorization, or (2) issued prescriptions for controlled substances after his DEA certificate for registration had expired. In both cases, Davenport argues that any such instance of wrongdoing were a product of internal office mistakes or his own negligence. Davenport further alleges that there are contradictory statements in the record regarding the unauthorized prescriptions.

Contrary to Davenport's assertions, there is substantial evidence in the record to find both that Davenport caused prescriptions to be issued for himself and his family without authorization and that he issued prescriptions for controlled substances after his DEA certificate had expired. First, in the agreed order between Davenport and the Tennessee Board, Davenport explicitly admitted to intentionally or negligently causing forty-one prescriptions to be issued for himself and his wife under another physician's name without the physician's authorization and to negligently

writing eight prescriptions for controlled substances after the expiration of his DEA certification to prescribe such substances. Furthermore, there was ample testimony elicited at the hearing as well as documentary evidence sufficient to support a factual finding that both of these things in fact occurred.

Though Davenport argues that there is not substantial evidence in the record to support a finding that he engaged in this misconduct *intentionally*, the argument is beside the point. First, the Deputy Administrator did not explicitly rely on a finding that Davenport's actions were intentional. The findings merely stated that he "called in or caused to be called in controlled substance prescriptions for himself and his wife using other physician's names; and negligently issued prescriptions for controlled substances after his DEA registration had expired." More importantly, it is not necessary for the Deputy Administrator to make a finding of intentional conduct before denying an application; instead, the only inquiry is whether the issuance of an application would be "inconsistent with the public interest." 21 U.S.C. § 823(f). The Deputy Administrator's findings regarding the unauthorized prescriptions were supported by substantial evidence in the record and thus should not be disturbed on appeal.

Finally, Davenport argues that substantial evidence is lacking in the record to support the Deputy Administrator's ultimate decision to deny Davenport's application for a DEA certificate of registration as inconsistent with the public interest. Davenport bases this argument upon the fact that mitigating factors, such as Davenport's acknowledgment of his mistakes with respect to maintaining and dispensing controlled substances, "render his registration at the present time consistent with the public interest."

Although the ALJ found that the government had met its burden of proof for a denial of

Davenport's application, she nonetheless recommended that the certificate be issued to Davenport subject to several restrictions and conditions. The Deputy Administrator rejected that recommendation and instead ordered that Davenport's application be denied. This court's ability to review the sanctions imposed by a deputy administrator is very limited. *See Butz v. Glover Livestock Comm'n Co.*, 411 U.S. 182, 185 (1973) ("[W]here Congress has entrusted an administrative agency with the responsibility of selecting the means of achieving the statutory policy the relation of remedy to policy is peculiarly a matter for administrative competence.") (internal quotation marks and citation omitted). The sanction may only be set aside where it is unwarranted in law or without justification in fact. *Id.* at 185-86.

The DEA is explicitly authorized pursuant to 21 U.S.C. § 823(f) to reject an application for a certificate of registration where the issuance of the certificate is inconsistent with the public interest. The Deputy Administrator made such a finding, based on detailed reasoning supported by substantial evidence in the record. This court owes deference to the DEA's chosen sanction in this case. *See Murphy v. DEA*, No. 96-9507, 1997 WL 196603, at *6 (10th Cir. Apr. 22, 1997) (upholding DEA sanction of revoking physician's DEA certificate of registration because DEA is explicitly authorized to do so by statute, despite court's opinion that the sanction was, on the facts of the case, "troublesomely severe").

**III.**

For the foregoing reasons, we affirm the Deputy Administrator's final order denying Davenport's application for a DEA certificate of registration.