NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0099n.06

No. 13-2368

**FILED**
Feb 02, 2015
DEBORAH S. HUNT, Clerk

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| CHRISTOPHER ARMSTRONG | ) | |
| | ) | |
|     Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| ANDREW L. SHIRVELL | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
|     Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

BEFORE:     NORRIS, MOORE, and GIBBONS, Circuit Judges.

JULIA SMITH GIBBONS, Circuit Judge. Andrew Shirvell, an alumnus of the University of Michigan and a former Assistant Attorney General for the State of Michigan, engaged in an online and in-person "campaign" against Christopher Armstrong, the former president of the University of Michigan's student council. Shirvell appeals many aspects of the proceedings in the district court, which resulted in the jury finding him liable for defamation, false light invasion of privacy, intentional infliction of emotional distress, and stalking. Most of Shirvell's objections lack merit, and we therefore affirm in part. The district court committed plain error, however, in its treatment of the compensatory damages for false light. We therefore reverse in part, vacate the judgment, and remand with instructions for the court to enter judgment in Armstrong's favor for the reduced amount of $3.5 million. This represents the total sum that the jury awarded, less the damages for false light.

I.

In 2010, Christopher Armstrong was elected president of the student council at the University of Michigan in Ann Arbor. The student council does not make University policy, but it works with, reports to, and advises the University on a range of issues.

Andrew Shirvell, a 2002 graduate of the University, worked as an Assistant Attorney General for the State of Michigan. In early 2010, Shirvell learned via an online newspaper report of Armstrong's election and also learned that Armstrong was openly gay. Shirvell began posting on his Facebook page about Armstrong, whom he had never met. Among other comments, Shirvell called Armstrong "dangerous" and a "radical homosexual activist" and a "major-league fanatic who is obsessed with imposing the radical homosexual agenda on the student body." Shirvell also set up a Facebook "fan page," entitled "Michigan Alumni and Others Against Chris Armstrong's Radical MSA Agenda," which purported to "expos[e] the real Chris Armstrong." He urged others, via Facebook and email, to join the "pro-family" group in order to "fight[] against Satan's representative." Shirvell took to his personal Facebook page to express outrage when Facebook deleted his "fan page" about Armstrong. He wrote: "I will not be SILENCED by the likes of Armstrong. You're going down fruity-pebbles." His self-proclaimed "outrage" continued from there: "I better not see Chris Armstrong at MY [church] parish in Charlotte – that's all I got to say." He claimed that Armstrong was scared of him and—in commenting on another story involving gay students—"remember[ed] the good old days when 'guys' like this would get their asses kicked at school."

Not content with Facebook posting, Shirvell then established a blog entitled "Chris Armstrong Watch," which discussed Armstrong's "character and his agenda and other items." The blog purported to be a "watch site," providing "testimony" and "an expose of the REAL

Chris Armstrong." The blog was accessible to the public from April 2010 until September 30, 2010, when Shirvell removed it from public view. The blog featured a picture of Armstrong's face next to a swastika. It called Armstrong "a radical homosexual activist, racist, elitist, & liar." It attributed to Armstrong a "Nazi-like hatred of the First Amendment," explaining, "Much like Nazi Germany's leaders, many of whom were also homosexuals, Armstrong believes that any and all opposition must be suppressed by whatever means necessary." The blog further stated that Armstrong "mocks Christians," and called Armstrong an "anti-Christian bigot[]." One entry claimed that Armstrong attended an event "whose intent was to encourage underage drinking," and that Armstrong "spent most of this time [after the semester ended] engaging in underage binge-drinking." The blog made repeated references to Armstrong's participation in—and facilitation of—underage drinking. It alleged that Armstrong showed contempt toward law enforcement. Shirvell—re-posting online conversations between Armstrong and another student at the University—claimed that these conversations revealed Armstrong's "tendency toward sexual promiscuity," and thus labeled Armstrong "a perverted homosexual exhibitionist." Shirvell interpreted another online conversation as demonstrating that Armstrong had previously hosted an "orgy" in his college dormitory, at which "homosexual shenanigans" were rampant. Days after this entry, Shirvell authored another blog post proclaiming: "Armstrong engages in sexual escapades at 'churches & children's playgrounds.'" He linked Armstrong to "possible involvement" in violent attacks against places of worship in the wake of California's passage of Proposition 8. He alleged that Armstrong used his welcome to freshmen as "a thinly veiled attempt to cause sexually confused, and perhaps some impressionable, 17-and-18-year-olds to experiment sexually with members of their own gender."

Shirvell also reported on an alleged romantic relationship between Armstrong and another student. Shirvell claimed that the other student was "not out of the closet," but that Armstrong "basically seduced" the student and quickly became obsessed with him. Explaining that the other student, "[t]hanks in large part to Armstrong's influence . . . has indeed morphed into a proponent of the radical homosexual agenda," Shirvell called Armstrong "a very, very twisted sick individual who is manipulative and cunning in a most devilish way."

Shirvell also appeared on television to rant about Armstrong. In September 2010, in an interview on local station WXYZ, he said that Armstrong held the presidential position in order "to promote special rights for homosexuals at the cost of . . . heterosexual students." Shirvell later appeared in front of a national audience with CNN's Anderson Cooper. Standing by his blog and Facebook posts, Shirvell told Cooper that he had "gotten stuff from third-party sources," and argued that Armstrong was not giving interviews because "he can't defend what's on the blog." When Cooper suggested that Shirvell was a bigot, Shirvell retorted, "The real bigot here is Chris Armstrong." Two days later, back before a national audience on Comedy Central's *The Daily Show*, Shirvell said that Chris was "acting like a gay Nazi," and that this explained his decision to include a picture of Armstrong next to a swastika on the blog.

Across these various forums, Shirvell attempted to justify his commentary by pointing to several purportedly legitimate concerns. Shirvell, a proud Roman Catholic, apparently feared that Armstrong would discriminate against Christian, pro-life, and pro-family people. In one post, Shirvell warned that these groups would be "violently persecuted." Second, he claimed that "Armstrong's radical agenda includes mandating 'gender-neutral' housing" at the University, an initiative that Shirvell opposed. Third, he believed that Armstrong would use his platform as president to "promote the homosexual lifestyle." Finally, Shirvell opposed

Armstrong's membership in a student group known as the Order of the Angell, an organization that—according to Shirvell—was known as "the University of Michigan's version of the KKK," and had "a well-documented history of racism and elitism." Shirvell claimed that Armstrong lied before the election about his intentions to join the group.

In addition to broadcasting his views, Shirvell tracked Armstrong down in Ann Arbor. At first, Shirvell posted flyers around campus and in students' mailboxes. He soon discovered Armstrong's off-campus residence and made an appearance at a party there. On several occasions, he marched up and down the street outside Armstrong's house, protesting. Fearing for his safety and that of his roommates when they needed to leave their home, Armstrong called the campus Department of Public Safety and received an escort. Shirvell later followed Armstrong to two campus events in the space of a day, holding a sign that branded Armstrong a racist liar and advertised the Chris Armstrong Watch blog. On one occasion, Shirvell stood outside Armstrong's residence while Armstrong was hosting a party, called police to complain about the noise, then filmed the ensuing proceedings and posted about the party on his blog. On one occasion, while Armstrong was speaking at a rally, Shirvell heckled him and took pictures of him. After discovering online that Armstrong planned to attend a friend's birthday party, Shirvell went, uninvited, to the party. Armstrong and his friends became concerned.

Shirvell approached students outside of an Ann Arbor night club on one occasion—while holding a sign saying "Chris Armstrong is a racist liar," and quizzed them about their online conversations. Shirvell told one student that he planned to go to her house the following day because he had heard she was hosting a party. The friend, afraid that Shirvell might endanger her guests, decided to cancel the party. Another time, Shirvell learned that Armstrong's friends were celebrating a birthday at a bar. He showed up at the bar, then followed the group to another

bar around a mile away. When confronted, he lied about his identity, then asked for Armstrong. Shirvell believed Armstrong was supposed to be with the group, and produced a printed Facebook invitation to prove it.

Shirvell continued to monitor Armstrong's activities even while Armstrong was off campus. In the summer of 2010, Shirvell learned that Armstrong was working as an intern in Washington, D.C., in the office of then-Speaker Nancy Pelosi. In a blog post entitled "Pelosi's Office Reconsiders Armstrong's Internship; Currently Investigating His Ties to Racist Student Group," Shirvell explained that he personally contacted a Pelosi aide, provided him with documents about Armstrong's membership in the Order of the Angell, and was assured that the aide would investigate further. In several phone calls and messages to Pelosi's office, Shirvell accused Armstrong of being a racist and of having lied to minority students' faces.

University authorities were concerned about Shirvell's actions. Beginning in June 2010, University police reports detail Shirvell's ongoing harassment of Armstrong. Ann Arbor police also became involved. In July 2010, police asked Shirvell to stop contacting Armstrong, but Shirvell continued, undeterred. In the fall of 2010, the University police issued Shirvell a trespass warning, banning Shirvell from the University campus. The warning was later modified, allowing Shirvell onto campus, but still requiring him to avoid contact with Armstrong. The police were familiar with peaceful protests on campus but believed Shirvell's conduct was different. The Deputy Chief of the University police testified that the warning was necessary because Shirvell was "obsessed with" Armstrong, and was perceived as a threat to him. Despite this, the prosecutor's office declined to issue a criminal warrant against Shirvell. The Deputy Chief believed that Shirvell's sole reason for focusing on Armstrong was "that he

was against him being gay." Even at the time of trial—after Armstrong had graduated and the trespass warning had expired—the Deputy Chief remained concerned about Armstrong's safety.

In April 2011, Armstrong sued Shirvell in Michigan state court for defamation, intentional infliction of emotional distress, abuse of process, false light, intrusion, and stalking. Shirvell removed the case to federal court.[1] Armstrong later dismissed the abuse of process claim and the court granted summary judgment on the intrusion claim. The court denied Shirvell's motion for summary judgment on the remaining claims. Armstrong requested that Shirvell retract certain statements, but Shirvell refused.

A jury trial occurred in August 2012. Shirvell moved for judgment as a matter of law at the close of Armstrong's evidence and renewed the motion at the close of all evidence. The court took the motions under advisement. The jury found Shirvell liable on all counts. On the defamation claim, the jury found that Shirvell made some of his defamatory statements negligently and made others with actual malice. The jury marked on the verdict form the statements that were made with actual malice and the ones that were made with negligence and also indicated that eleven specific statements constituted defamation *per se*. The jury awarded $4.5 million in total damages.[2]

Thereafter, the district court entered an order denying Shirvell's oral motion for judgment as a matter of law. The court entered judgment for Armstrong for $4.5 million plus interest. The court also denied Shirvell's post-judgment motion for judgment as a matter of law and his motion for a new trial or remittitur.

---

[1] Shirvell counterclaimed for defamation, false light, and tortious interference. The district court dismissed the counterclaims. Shirvell does not appeal these rulings.

[2] The jury awarded $750,000 in compensatory damages and $500,000 in exemplary damages for defamation, $1,000,000 in compensatory damages for casting Armstrong in a false light, $1,750,000 in compensatory damages for intentional infliction of emotional distress, and $100,000 in compensatory damages and $400,000 in exemplary damages for stalking.

Shirvell filed a timely notice of appeal. He brings a litany of challenges, attacking the sufficiency of the evidence on several claims and many of the district court's legal rulings. We address each challenge in turn.

II.

Shirvell brings a variety of claims relating to the defamation verdict, which he claims was "contrary to both law and fact." To prevail on a claim for defamation, a plaintiff must establish the following elements:

> (1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication [defamation per quod].

*Mitan v. Campbell*, 706 N.W.2d 420, 421 (Mich. 2005).

A.

First, Shirvell argues that his statements were not actionable as defamation because they were not subject to interpretation as actual facts and thus not capable of defamatory meaning. He points to "a sampling" of the statements on which the defamation claim was based and argues that some of these statements did not state actual facts about Armstrong, were not verifiably false, or were mere "rhetorical hyperbole or opinion." Even if Shirvell is correct with respect to a small subset of his comments, the overwhelming majority of his statements were capable of defamatory meaning and were correctly submitted to the jury.

In Michigan, "[a] communication is [generally] defamatory if it tends to lower an individual's reputation in the community or deters third persons from associating or dealing with that individual." *Ireland v. Edwards*, 584 N.W.2d 632, 636 (Mich. Ct. App. 1998). But statements are not actionable—and are protected by the First Amendment—if they cannot

"'reasonably [be] interpreted as stating actual facts.'" *Jolliff v. N.L.R.B.*, 513 F.3d 600, 610 (6th

Cir. 2008) (alteration in original) (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20

(1990)); *Garvelink v. Detroit News*, 522 N.W.2d 883 (Mich. Ct. App. 1994). "Whether a

communication is capable of bearing a particular meaning is a question of law." *Jolliff*, 513 F.3d

at 610. The court must determine whether a particular statement's "general tenor" suggests that

it can be read as stating an actual fact or is instead protected hyperbole. *See id.* (quoting

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990)). In order to do so, this court applies a

four-factor test:

> (1) The common usage or meaning of the allegedly defamatory
> words themselves, whether they are commonly understood to be
> loose, figurative, or hyperbolic words;
> (2) The degree to which the statements are verifiable, whether the
> statement is objectively capable of proof or disproof;
> (3) The immediate context in which the statement occurs; and
> (4) The broader social context into which the statement fits.

*Id.* at 611–12.

Applying these four factors in this case, the vast majority of Shirvell's statements were

capable of defamatory meaning because they can reasonably be interpreted as conveying actual

facts. The common usage of Shirvell's words does not suggest that they are commonly

understood as loose, figurative, or hyperbolic. Courts have held that words like "liar" and

"racist" have clear, well understood meanings, which are capable of being defamatory. *See*

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990); *Taylor v. Carmouche*, 214 F.3d 788, 793–94

(7th Cir. 2000); *Connaughton v. Harte Hanks Commc'ns, Inc.*, 842 F.2d 825, 840–41 (6th Cir.

1988). Shirvell's claims that Armstrong engaged in various forms of criminal or reprehensible

behavior—such as encouraging underage drinking, vandalizing churches, and mistreating police

officers—could similarly be read as conveying actual, serious facts that could be proved or

disproved. Shirvell's descriptions of Armstrong's alleged relationships and sexual behavior—alleging, for example, that Armstrong hosted an orgy or performed sexual acts in churches and playgrounds—are also capable of proof or disproof, and are not ordinarily understood as figurative or hyperbolic. The context in which Shirvell's statements appeared makes it even more certain that a reasonable person could interpret them as conveying actual facts. He characterized his blog as a "watch site," providing "testimony" and "an expose of the REAL Chris Armstrong." In his television interviews—in which he claimed the blog "breaks news," much of it obtained from "third-party sources," as part of "an issues type campaign," Shirvell made it abundantly clear that he wanted others to interpret the statements on the blog as actual facts.

Even if a small number of Shirvell's statements were incapable of defamatory meaning and were submitted to the jury in error—an issue we do not decide—the error was harmless. In determining whether an error is harmless, we look to whether the error "affect[s] the substantial rights of the parties." 28 U.S.C. § 2111; *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 553 (1984) (Harmless error "embod[ies] the principle that courts should . . . ignore errors that do not affect the essential fairness of the trial."). An error does not affect a party's substantial rights "[i]f one can[] say with fair assurance, . . . that the judgment was not substantially swayed by the error." *Beck v. Haik*, 377 F.3d 624, 634 (6th Cir. 2004) *overruled by on other grounds by Adkins v. Wolever*, 554 F.3d 650 (6th Cir. 2009) (quoting *Schrand v. Fed. Pac. Elec. Co.*, 851 F.2d 152, 157 (6th Cir. 1988)). "Application of this test is highly sensitive to the unique context of the particular case, including the one-sided or closely balanced nature of the evidence bearing upon the issue which the error arguably affected, and the centrality of that issue to the ultimate decision." *Id.* at 634–35 (quoting *Schrand*, 851 F.2d at 157); *see Kendel v.*

*Local 17-A United Food and Commercial Workers*, 512 F. App'x 472, 479–80 (6th Cir. 2013) (applying the "fair assurance" harmless error standard set forth in *Beck*).

The essence of a defamation claim is an injury to the plaintiff's reputation. *See* Stein on Personal Injury Damages § 5:44 (3d ed. 1997) ("The concept of general damages in the law of defamation encompasses losses suffered by the plaintiff which are usual and to be anticipated when a person's reputation is harmed."). In order to recover based on any particular statement in this case, Armstrong had to prove that "the statement had a tendency to harm [his] reputation." The court instructed the jury to award Armstrong damages based on the harm to his reputation, in addition to "compensation for any mental or emotional distress or humiliation suffered." The court further explained that "the amount of money to be awarded for certain of these elements of damages cannot be proved in a precise dollar amount," and that determining the amount was for the sound judgment of the jury.

Against this backdrop, any error that the district court may have made in improperly submitting a handful of statements to the jury was harmless because it is highly unlikely that those statements—in the context of the large number of statements the jury properly found defamatory—affected the damages award. The evidence in Armstrong's favor—demonstrating harm caused by statements that were properly submitted to the jury as defamatory—was immensely one-sided. Through a special verdict form, the jury found *over 100 statements* by Shirvell defamatory and *over 60 of those defamatory statements* were made with actual malice. The vast majority of those defamatory statements Shirvell does not even contest on appeal. *See Suarez-Diaz v. Holder*, 771 F.3d 935, 945 (6th Cir. 2014) ("[L]ike arguments that are not specifically raised on appeal, issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

There is very little chance that the small number of potentially erroneous statements made a difference in the quantum of harm to Armstrong's reputation, or to his mental or emotional state. His reputation would have already been decimated in the eyes of any person reading the "Chris Armstrong Watch" with the tendency to be influenced by that blog. Moreover, every single statement from the blog that was improperly submitted to the jury was included within a blog post containing material that was properly submitted to—and found defamatory by—the jury. As a result, even if some of the statements were not defamatory by themselves, they are unlikely to have had the independent effect of further lowering Armstrong's reputation in the eyes of the reader. To the extent that Armstrong was mentally or emotionally harmed by Shirvell's campaign against him, it is very unlikely that this harm hinged on any particular statement, or on any magic number of statements. The overall impression had already been made.

Similarly, the exclusion of these statements would not have made any difference with respect to the other categories of damages. The jury was entitled to award Armstrong any economic benefits for tangible losses—such as losses in wages or profits—flowing from the harm to his reputation. And, having found that Shirvell acted with actual malice, it was also entitled to award damages for the actual damages Armstrong suffered to his profession or occupation. Again, it is highly unlikely that any of these categories of damages turned on any individual statement, or any particular number of statements. Any harm in these areas would be the result of the reputational injury, which—as discussed—derived from the cumulative effect of a great number of defamatory statements.

For all of these reasons, we can say with "fair assurance," *Beck*, 377 F.3d at 634, that the defamation judgment would have been the same even if the district court had declined to submit

to the jury a handful of the more than 100 statements on the special verdict form. Shirvell has therefore failed to demonstrate any prejudicial error.

B.

Shirvell next argues that, even if the statements were capable of defamatory meaning, the district court should not have included many of them on the verdict form because Armstrong violated "basic pleading standards" by failing to give notice of all of these in the complaint. The district court refused Shirvell's request to limit the statements on the verdict form to those that were specifically mentioned in the complaint, and Shirvell challenges this ruling on appeal.

Shirvell's argument lacks merit because Armstrong did not violate pleading standards. In diversity cases, including those removed from state court, the federal pleading standards apply. *See* Fed.. R. Civ. P. 81(c)(1); *Granny Goose Foods, Inc. v. Bhd. of Teamsters and Auto Truck Drivers*, 415 U.S. 423, 438 (1974) (applying the Federal Rules of Civil Procedure to removed actions); *see also Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009). Armstrong was not required to allege the circumstances of defamation with particularity. *See* Fed. R. Civ. P. 8(a)(2) (generally requiring just "a short and plain statement of the claim"); Fed. R. Civ. P. 9(b) (requiring a party to plead fraud or mistake with particularity). While the plaintiff must give sufficient facts to support his claim, he need not provide every fact that may be raised at trial. *See Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436–37 (6th Cir. 1988) ("[A] complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory." (internal quotation marks omitted)).

Armstrong complied with these standards. His complaint made clear that he was referring to statements in Shirvell's blog and Facebook page, along with his television appearances. All of these were in evidence at trial. Moreover, the complaint referred to the

kinds of statements on which Armstrong was basing his defamation claim. There was no violation of pleading standards and there is no legal basis for limiting the statements on the verdict form to those specifically quoted in the complaint.

C.

Shirvell next challenges the district court's finding that Armstrong was a private figure. In a claim for defamation, a plaintiff who is a public figure can prevail only by showing that the defendant acted with actual malice. *See Compuware Corp. v. Moody's Investors Services, Inc.*, 499 F.3d 520, 525 (6th Cir. 2007) (citing *N.Y. Times v. Sullivan*, 376 U.S. 254, 279–80 (1964)).[3] By contrast, a plaintiff who is a private figure need show only negligence on the part of the defendant. Mich. Comp. Laws § 600.2911(7); *see also J & J Constr. Co. v. Bricklayers and Allied Craftsmen, Local 1*, 664 N.W.2d 728, 731–32 (Mich. 2003). Whether a plaintiff is a private or public figure is a question of law. *Falls v. Sporting News Publ'g Co.*, No. 89-1543, 1990 WL 41001, at *3 (6th Cir. Apr. 10, 1990).

According to Shirvell, the district court should have determined that Armstrong was a limited-purpose public figure.[4] This court recognizes that an individual may be considered a public figure with respect to a limited range of issues when a two-pronged test is satisfied. There must first be a "public controversy." *Thomas M. Cooley Law Sch. v. Kurzon Strauss, LLP*, 759 F.3d 522, 529 (6th Cir. 2014) (quoting *Clark v. ABC, Inc.*, 684 F.2d 1208, 1218 (6th Cir. 1982)). "'Second, the nature and extent of the individual's involvement in the controversy must be ascertained[,]' so that the court can determine whether the plaintiff voluntarily injected itself into

---

[3] The requirement that a plaintiff demonstrate actual malice when he is a public figure also applies in the context of false light and intentional infliction of emotional distress. *See Hustler Magazine v. Falwell*, 485 U.S. 46, 56 (1988) (intentional infliction of emotional distress); *Battaflieri v. Mackinac Ctr. for Pub. Policy*, 680 N.W.2d 915, 920–21 (Mich. Ct. App. 2004) (false light).

[4] Shirvell does not allege that Armstrong was a public figure for all purposes, otherwise known as a "pervasive public figure."

the particular public controversy giving rise to the alleged defamation." *Id.* (alteration in original) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974)).

A public controversy exists only if there is "a real dispute," *Cooley*, 759 F.3d at 529, not merely "a matter that attracts public attention." *Wolston v. Reader's Digest Ass'n*, 443 U.S. 157, 167 (1979). The dispute must affect "the general public or some segment of it in an appreciable way," and must "in fact [have] received public attention because its ramifications will be felt by persons who are not direct participants." *Cooley*, 759 F.3d at 529–30. The most important part of the court's analysis is to "'isolate the specific public controversy related to the defamatory remarks.'" *Id.* at 530 (quoting *World Wide Ass'n of Specialty Programs v. Pure, Inc.*, 450 F.3d 1132, 1137 (10th Cir. 2006)).

Armstrong was not a limited-purpose public figure here because Shirvell's defamatory remarks did not relate to any public controversy. For example, the jury found that Shirvell repeatedly referred to Armstrong as a racist and a liar, or words to the same effect, and alleged that Armstrong mocked and attacked Christianity. No public controversy existed as to Armstrong's honesty or his views on race or religion. There is no evidence that anyone besides Shirvell saw Armstrong's character for truthfulness as a live issue or a subject of debate. Nothing in the record indicates that any public controversy existed over Armstrong's religious views or his behavior toward Christians. Similarly, there is no evidence of public dispute over Armstrong's treatment of—or views on—others based on their races. Even if Shirvell could portray the limited interest in Armstrong's membership in the Order of the Angell as a public controversy related to race—which is by no means a given—Armstrong did not voluntarily inject himself into any such controversy; he did nothing more than join the organization. Armstrong cannot possibly have been a public figure with respect to these "issues."

Other prominent themes in Shirvell's commentary were Armstrong's personal life and sexual behavior. Once again, the record is completely devoid of any evidence that Armstrong's conduct affected anyone beyond the immediate participants, or that anyone besides those participants and Shirvell had any interest in the conduct. There was, therefore, no public controversy and no chance of Armstrong being a public figure on these issues.

Shirvell cannot transform Armstrong's private conduct into a public controversy simply by alleging that Armstrong "promoted" the gay lifestyle. The fact that Armstrong was occasionally involved on campus in organizations seeking to "improve the lives of LGBT students on campus," does not make his own sexual behavior a matter of public controversy. Similarly, a public controversy over Armstrong's sex life does not arise simply because Armstrong is openly gay.

Finally, Shirvell's claims about Armstrong's agenda as student council president do not confer on Armstrong the status of limited-purpose public figure. The record is completely lacking in any indication that Armstrong's alleged promotion of "the homosexual lifestyle," as Shirvell puts it, generated any public debate whatsoever. Shirvell points to just one real issue that could potentially merit any public interest: Armstrong's support for gender-neutral housing on campus. But again, there is no evidence here of the type of real dispute that must exist in order to find that a person is a limited-purpose public figure. There is no evidence of there being significant disagreement or debate over the student council's recommendation of gender-neutral housing, a recommendation that had no direct impact on University policy. Although Shirvell was personally outraged at the initiative, it was not an issue that generated public controversy.

In his attempt to portray Armstrong as a public figure, Shirvell points to several local newspaper articles in which Armstrong is quoted. These do not support Shirvell's position for

reasons already discussed. For example, two of the articles relate to the student council's consideration of gender-neutral housing. This was not a topic of public controversy. Several relate to Armstrong's support for LGBT rights. This does not make Armstrong a public figure on the issue of his personal sexual conduct or his views on LGBT rights. One article details Armstrong's opposition to a singer due to perform on campus. Even if this did show a public controversy, it is unrelated to the issues on which Shirvell commented.

Armstrong was not a public figure for any purpose connected to Shirvell's defamatory remarks. As a result, Armstrong was required to show only that Shirvell acted negligently with regard to the truth of his statements in order to recover for defamation. Mich. Comp. Laws § 600.2911(7); *see also J & J Constr. Co.* 664 N.W.2d at 731–32.

D.

Next, Shirvell challenges the jury's finding that he acted with actual malice. As discussed, the district court properly characterized Armstrong as a private figure, and there is therefore no need to establish actual malice in order to satisfy the prima facie elements of defamation. *See* Mich. Comp. Laws § 600.2911(7). However, actual malice remains relevant in another sense: Armstrong was required to prove it in order to be entitled to certain categories of damages. A private-figure plaintiff who proves actual malice is entitled to damages for "the actual damages which he or she has suffered in respect to his or her property, business, trade, profession, occupation, or feelings." Mich. Comp. Laws § 600.2911(2)(a); *see Glazer v. Lamkin*, 506 N.W.2d 570, 572 (Mich. Ct. App. 1993). On the other hand, if the publication of the defamatory statement was merely negligent, a private figure may recover only for provable economic damages. Mich. Comp. Laws § 600.2911(7); *Glazer*, 506 N.W.2d at 572–73. Shirvell's challenge to the actual-malice determination therefore remains relevant.

Here, the jury found—and awarded damages based on—negligence for some of Shirvell's statements and actual malice for others. This court will uphold a jury verdict unless it is "contrary to the 'clear weight of the evidence.'" *Bates v. Dura Auto. Sys., Inc.*, 767 F.3d 566, 581 (6th Cir. 2014) (quoting *Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 820–21 (6th Cir. 2000)). The court "can properly defer to the jury on historical facts [and] credibility determinations." *Young v. Gannett Satellite Info. Network*, 734 F.3d 544, 549 (6th Cir. 2013).

"To show actual malice, plaintiffs must prove that the defendant made the statement with knowledge that it was false or with reckless disregard of the truth." *Glazer*, 506 N.W.2d at 573 (citing *Hodgins v. Times Herald Co.*, 425 N.W.2d 522 (1988)).[5] The test for actual malice is subjective: the issue is "whether the publisher in fact entertained serious doubts concerning the truth of the statements published." *Tomkiewicz v. Detroit News, Inc.*, 635 N.W.2d 36, 46 (Mich. Ct. App. 2001) (internal quotation marks omitted). Actual malice does not arise from a mere failure to investigate, *id.*, but "the purposeful avoidance of the truth is in a different category." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 692 (1989). Actual malice also does not derive from defendant's preconceived objectives, or even from the defendant's hatred toward the plaintiff. *Tomkiewicz*, 625 N.W.2d at 46. But "it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry." *Harte-Hanks Commc'ns*, 491 U.S. at 668. Fabrications of facts are clear examples of actual malice. *See St. Amant v. Thompson*, 390 U.S. 727, 732 (1968).

---

[5] As stated, actual malice is relevant here only to the types of damages available under Michigan law. Given that Armstrong is not a public figure, actual malice is not a *prima facie* requirement for liability. Michigan cases do not definitively state that the jury must find actual malice in this context by clear and convincing evidence, which is the required burden under the First Amendment when actual malice is an element of liability for a public-figure plaintiff. *See Cobb v. Time, Inc.*, 278 F.3d 629, 636 (6th Cir. 2002) (citing *N.Y. Times*, 376 U.S. at 285). But it is likely that clear and convincing evidence is the burden under Michigan law. *See* Mich. Pleading and Practice § 78:24 ("[A] private plaintiff's recovery is limited to economic damages unless he or she demonstrates malice by clear and convincing proof."). Here, even considering that high burden, the jury's verdict was not contrary to the clear weight of the evidence.

Here, the record—viewed in the light most favorable to Armstrong—contains plentiful evidence from which the jury could have found by clear and convincing evidence that Shirvell acted with actual malice. A reasonable jury could conclude from the evidence that many of Shirvell's statements were pure fabrications. For example, he claimed that the police "raided" Armstrong's house during a party, but the evidence contradicted this. A reasonable jury could conclude that Shirvell—who was standing outside, filming the house—simply fabricated his story.

Shirvell claimed naivety with regard to other false statements, but a reasonable jury could certainly view this as disingenuous. Shirvell claimed, for example, that "Armstrong engages in sexual escapades at 'churches & children's playgrounds,'" and that Armstrong hosted an orgy in his dormitory. Shirvell based these claims on online discussions between Armstrong and his friends. A reasonable jury could see these discussions as being so obviously facetious as to render implausible Shirvell's argument that he had no reason to know of the falsity of these claims. Shirvell also claimed that he backed up his assertions with his own investigations, a claim a reasonable jury could have rejected.

Shirvell's vindictive motives—though insufficient alone to establish actual malice—could bolster a reasonable jury's impression that Shirvell was interested simply in reporting scandalous assertions about Armstrong rather than delivering the truth. For example, enraged at Facebook's deletion of his "fan page," Shirvell threatened, "You're going down." The inflammatory language on the blog further supports this view of Shirvell's motive.

Shirvell argues that it was "clear" that he did not act with actual malice because of his testimony that he believed his statements about Armstrong were true. However, the jury clearly found—and was entitled to find—that Shirvell was not a credible witness. Despite the

testimony, the jury was therefore free to find that Shirvell acted with actual malice. Sufficient evidence existed to support such a finding.

### E.

Shirvell next contends that Armstrong failed to prove various other aspects of his defamation claim. Although his argument is not artfully stated, it appears that he is challenging the district court's denial of his renewed motion for judgment as a matter of law. He moved for judgment as a matter of law at the close of Armstrong's evidence and renewed the motion at the close of all evidence. Having taken both motions under advisement, the court later denied them in a written order.

To evaluate the district court's decision on a motion for judgment as a matter of law in diversity cases, we apply "the standard of review used by the courts of the state whose substantive law governs the action." *Tompkins v. Crown Corr, Inc.*, 726 F.3d 830, 844 (6th Cir. 2013) (internal quotation marks omitted). In Michigan, "[w]hen reviewing a trial court's decision on a motion for a directed verdict, the standard of review is de novo and the reviewing court must consider the evidence in the light most favorable to the nonmoving party." *Zsigo v. Hurley Med. Ctr.*, 716 N.W.2d 220, 220 (Mich. 2006).

### i.

Shirvell contends that Armstrong failed to prove that the statements lowered Armstrong's reputation, as required for a defamation claim. *See Ireland*, 584 N.W.2d at 636. We disagree. The record reveals that Armstrong received negative emails. Armstrong testified that Shirvell set out to damage the reputation Armstrong had built for himself, and that the lies in the blog were "just raking my entire family's reputation across the ground." He also discussed at some length

the way in which his professional reputation appeared to suffer as a result of Shirvell's statements.

Shirvell's theory is that the blog did not damage Armstrong's reputation but enhanced it. Shirvell points to the support that Armstrong received from the University and elsewhere. But, viewed in the light most favorable to Armstrong, this evidence simply shows that others were concerned about him and sought to help him. This kind of reaction is not inconsistent with a damaged reputation. Overall, a reasonable jury had sufficient evidence to find that Armstrong's reputation was harmed.

ii.

Shirvell next argues that Armstrong failed to prove damages for defamation. We again disagree.

The jury properly found that eleven of Shirvell's statements constituted defamation *per se* because they imputed to Shirvell the commission of criminal offenses. *See* Mich. Comp. Laws § 600.2911(1). "In cases involving defamation per se, damages need not be proven because injury is presumed." *Cofessco Fire Prot. v. Bruce Steele, Vanguard Fire & Supply Co.*, Nos. 290959, 292357, 2010 WL 3928724 (Mich. Ct. App. Oct. 7, 2010). This establishes that Armstrong was entitled at least to nominal damages. *Id.* The district court therefore correctly declined to grant judgment as a matter of law in Shirvell's favor. "Where the defamatory publication is 'maliciously published,' the person defamed may recover 'substantial damages' even where no special damages could be shown." *Burden v. Elias Bros. Big Boy Rests.*, 613 N.W.2d 378, 382 (Mich. 2000) (citing *Whittemore v. Weiss*, 33 Mich. 348, 353–54 (1876)); *see also Mich. Microtech, Inc. v. Federated Publ'ns, Inc.*, 466 N.W.2d 717, 722 (Mich. Ct. App. 1991) ("Special damages, a part of actual damages, are losses having economic or pecuniary value.").

The jury was therefore entitled to return a verdict for substantial damages for the statements that constituted defamation *per se* and were made with actual malice.

For the remainder of the statements—those not designated as defamation *per se*—Armstrong was able to prove actual damages. As discussed, the jury was properly instructed to award economic damages for the defamatory statements that Shirvell made negligently, and—for those statements made with actual malice—to award damages "for the actual damages which he or she has suffered in respect to his or her property, business, trade, profession, occupation, or feelings." Mich. Comp. Laws § 600.2911(2)(a); *see Glazer*, 506 N.W.2d at 573. The jury not only addressed losses suffered at the time of trial, but also properly considered continuing losses that were the result of Shirvell's conduct.

The record contains ample evidence of losses for which the jury was entitled to award damages. A reasonable jury could certainly have found that Armstrong suffered—and would continue to suffer—economic losses as a result of Shirvell's defamatory statements about him. Armstrong testified that he had applied to Teach for America before Shirvell's campaign began, but that he was rejected from the program after the statements began to emerge on the blog and elsewhere. Once Shirvell's comments began, Armstrong also found himself unable to focus on pursuing career opportunities. Although he applied to "one or two" jobs before the end of the year, he did not find employment, and settled for interning instead. At the time of trial, Armstrong was employed, making $24,000 per year. But he was concerned about his ability to find work in the future. He elaborated:

> every time I apply for a job, the employers have to make a choice whether or not they want to associate with this entire background I have, whether or not they want to associate with someone who has essentially some[one] who is going to try to potentially attack them again and blog about them and defame them and potentially draw their company into it as well.

He further discussed his career plans on cross examination, saying that he was potentially interested in a career in politics, but that "I'm not sure . . . if that's going to be viable for me." This evidence gave the jury a sufficient basis to find that Armstrong suffered economic losses as a result of Shirvell's defamatory statements.

The record also contained significant evidence of the emotional harm that Armstrong suffered. He found Shirvell's comments "hurtful, overwhelming and infuriating." He was "beside [him]self" at some of the allegations, which he found "damaging." He suffered a loss of confidence and an increase in stress. Realizing he needed help, a University official led him into a counseling session, "an intervention of sorts." He testified, "I broke down, just cried for . . . a very long time." He explained, "I was pretty low at that point," and believed he was going through a period of depression. He felt like Shirvell "wasn't going to stop." Others corroborated Armstrong's testimony. For example, his father testified that "there was tension in his voice," and that over time, "he became more insistent that we not look at the blog; that there was nothing we could do." Even at the time of trial, Armstrong testified that the events were "absolutely" going to stay with him.

Viewing all of this evidence in Armstrong's favor, there was sufficient evidence for a jury to award significant compensatory damages. The district court correctly denied Shirvell's renewed motion for judgment as a matter of law. We affirm the defamation award in its entirety.

III.

We next consider the challenges related to Armstrong's other claims. First among those, Shirvell argues that the verdict for false light invasion of privacy should be reversed because the jury found that the same statements constituted both false light and defamation. We agree, and we therefore reverse the damages award for false light.

Under Michigan law, a party may bring an action for both false light invasion of privacy and defamation, but may "'have but one recovery for a single instance of publicity.'" *Morganroth v. Whittal*, 411 N.W.2d 859, 863 (Mich. Ct. App. 1987) (quoting Restatement (Second) of Torts § 652 cmt. (b) (1965)). Here, the jury found that seventy-seven of Shirvell's statements constituted false light. The jury found that each one of those statements also constituted defamation. It then awarded a total of $1.25 million in damages for defamation and $1 million for false light. It did not specify whether each statement generated damages for the defamation claim or the false light claim. This suggests that the verdict allowed Armstrong to recover for the same harm under two separate theories.

Armstrong argues that the jury separated the verdicts for defamation and false light and that there was no basis for assuming that double recovery resulted. But it is difficult to see how this verdict could represent anything other than double recovery. The jury was assessing the same harm caused by the same statements and awarded a lump-sum figure for both. There appears to be no plausible way in which the jury could have awarded damages for distinct harms. The court should consider the verdict form in combination with the jury instructions. *See Hickson Corp. v. Norfolk S. Ry.*, 260 F.3d 559, 568 (6th Cir. 2001). Here, the district court did not instruct the jury that it could not award damages for the same injury under both theories. In the course of the instructions on damages for defamation, the court did explain that the jury could not account for the same harm in both the actual damages award and the exemplary damages award. But the court did not set out any specific principles for awarding damages for the false light claim, leaving the jury to award damages on the same basis as it awarded damages for defamation. The instructions therefore make it even less likely that the jury separated out the damages. It is true that "'it is incumbent upon . . . an appellate court . . . to reconcile the [jury's]

answers if possible under any view of the evidence in the case.'" *Johnson v. Howard*, 24 F. App'x 480, 485 (6th Cir. 2001) (quoting *Waggoner v. Mosti*, 792 F.2d 595, 597 (6th Cir. 1986) (internal quotation marks omitted)). But there is no logical way in which the jury could have found as it did without permitting double recovery.

Armstrong correctly argues that Shirvell failed to specifically object to the jury instructions for their potential to permit double recovery. If Shirvell had invited the district court's error by affirmatively suggesting the jury instructions containing the double recovery problem, we would have discretion to consider the issue waived or—if the interests of justice required it—to consider the issue. *See Fryman v. Fed. Crop Ins. Corp.*, 936 F.2d 244, 250–51 (6th Cir. 1991). Here, Shirvell did not invite the error; he simply failed to object.[6] In these circumstances, we must review for plain error, meaning that we reverse if there is an "obvious and prejudicial error that requires action by the reviewing court in the interests of justice." *See Reynolds v. Green*, 184 F.3d 589, 594 (6th Cir. 1999) (internal quotation marks omitted).

The district court's error in the present case falls within this definition. In light of Michigan's clear rule against double recovery for defamation and false light, it was an obvious error to enter judgment on a verdict that awarded damages for the same harm under both theories. Shirvell suffered significant prejudice as a result: the jury awarded $1 million in damages against him—over twenty percent of the total damages award—for harm for which Shirvell was already required to pay. This rises to the level of plain error. The damages award

---

[6] Both Shirvell and Armstrong submitted proposed jury instructions and both objected to the instructions that the other party proposed. At trial, the district judge—believing that the parties' differences were "all a question of style"—suggested using Michigan's Model Civil Jury Instructions. The parties both acquiesced to an extent, though Shirvell raised certain objections unrelated to the potential for double recovery. But for several reasons, this does not constitute an invited error giving rise to a complete waiver. First, Shirvell's proposed instructions would have included an instruction seeking to avoid double recovery. Second, after the district court suggested using the model instructions, the record suggests that Shirvell shared his belief that the jurors would be entitled to find that individual statements constituted either false light *or* defamation. Third, Shirvell raised the double-recovery problem in his renewed motion for judgment as a matter of law. The district court could have vacated the damages award for false light at that time but declined to do so.

for false light should therefore be reversed. We remand to the district court with instructions to enter judgment reflecting the deduction of the $1 million that was awarded for false light.

IV.

Shirvell next argues that the verdict for intentional infliction of emotional distress (IIED) must be reversed. "Although the Michigan Supreme Court has not recognized IIED claims, this Court has assumed that it will do so." *Ogle v. Hocker*, 279 F. App'x 391, 400 (6th Cir. 2008) (citing *Andrews v. Prudential Sec., Inc.*, 160 F.3d 304, 309 (6th Cir. 1998)). To prevail on a claim for IIED, a plaintiff must demonstrate: "'(1) the defendant's extreme and outrageous conduct, (2) the defendant's intent or recklessness, (3) causation, and (4) the severe emotional distress of the plaintiff.'" *Lucas v. Awaad*, 830 N.W.2d 141, 150 (Mich. Ct. App. 2013) (quoting *Dalley v. Dykema Gossett PLLC*, 788 N.W.2d 679, 694 (Mich. Ct. App. 2010)).

Shirvell claims that Armstrong failed to offer sufficient evidence of extreme and outrageous conduct, and that, because this is initially a question of law, *VanVarous v. Burmesiter*, 687 N.W.2d 132, 142 (Mich. Ct. App. 2004), the court should have not allowed the IIED claim to reach the jury. Again, this court applies the standard of review that would apply in Michigan courts, *Tompkins*, 726 F.3d at 844, which is *de novo*. *See Zsigo*, 716 N.W.2d at 220.

Liability attaches "only when a plaintiff can demonstrate that the defendant's conduct is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Dalley*, 788 N.W.2d at 694 (internal quotation marks and alterations omitted). "Mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" do not suffice. *Id.* (internal quotation marks and alterations omitted). Rather, "the distress must be so severe that no reasonable person could be expected to endure it."

*Cassise v. Walled Lake Consol. Sch.*, No. 257299, 2006 WL 445960, * 3 (Mich. Ct. App. Feb. 26, 2006) (citing *Haverbush v. Powelson*, 551 N.W.2d 206, 209 (Mich. Ct. App. 1996)). Courts have also said that extreme and outrageous conduct exists when "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Doe v. Mills*, 536 N.W.2d 824, 834 (Mich. Ct. App. 1995) (citing *Roberts v. Auto-Owners Ins. Co.*, 374 N.W.2d 905, 909 (1985)). In making this determination, the court should consider all of the circumstances of the case. *See Sawabini v. Desenberg*, 372 N.W.2d 559, 565 (Mich. Ct. App. 1985). If reasonable minds would differ, the task of determining whether the conduct is extreme and outrageous is for the jury. *See Doe*, 536 N.W.2d at 834.

Shirvell's conduct rises to such a level that the district court correctly allowed the jury to decide whether it was extreme and outrageous. In Shirvell's view, his actions were "annoying and oppressive" at worst, and so do not meet the threshold. Michigan courts have not addressed any cases similar to this one, but that does not mean Shirvell's conduct was not outrageous. Indeed, the unusual and extreme nature of his conduct probably explains the absence of similar situations in other cases. Viewed in the light most favorable to Armstrong, however, Shirvell's behavior features some of the hallmarks of extreme and outrageous conduct that are present in other cases. For instance, the harassment continued over a period of time, despite requests to stop. *See Margita v. Diamond Mortg. Corp.*, 406 N.W.2d 268, 272 (Mich. Ct. App. 1987). The conduct was motivated largely by discrimination. *See Ledsinger v. Burmeister*, 318 N.W.2d 558, 562 (Mich. Ct. App. 1982). It included intrusions into, and false claims about, Armstrong's private sexual conduct. *See Linebaugh v. Sheraton Mich. Corp.*, 497 N.W.2d 585, 588 (Mich. Ct. App. 1993). A reasonable person could certainly find this conduct extreme and outrageous,

such that a reasonable person should not be expected to endure it. The district court was therefore correct to submit the IIED claim to the jury.

Shirvell next contends that, even if Armstrong satisfies the *prima facie* elements of IIED, the First Amendment was a complete defense to the claim. He cites *Snyder v. Phelps*, 131 S. Ct. 1207 (2011), which indeed recognizes that the First Amendment may serve as a defense to IIED in some circumstances. *Id.* at 1215 (citing *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50–51 (1988)). But the speech at issue in *Snyder* addressed a matter of public concern. The Court recognized that "where matters of purely private significance are at issue, First Amendment protections are often less rigorous." *Id.* (citing *Hustler Magazine*, 485 U.S. at 56).

Shirvell's speech touched on matters of private concern. "Speech deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' . . . or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'" *Snyder*, 131 S. Ct. at 1216 (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983); *San Diego v. Roe*, 543 U.S. 77, 83–84 (2004) (per curiam)). As discussed in the defamation context, a small amount of Shirvell's speech legitimately discussed Armstrong's leadership and policies. It is doubtful that even this small category of speech was on a matter of public concern, given that Armstrong's leadership of a student group was of concern only to a very narrowly-defined community, while Shirvell reached a national audience. *See Gilbrook v. City of Westminster*, 177 F.3d 839, 866 (9th Cir. 1999) ("[T]he audience chosen for the speech also [is] relevant to the public-concern inquiry."). Even if this speech did touch upon a matter of public concern, the majority of Shirvell's speech—including the content that caused Armstrong the severe emotional distress—focused on Armstrong's private life, including his relationships and sexual conduct. This is not even

remotely a matter of interest or concern to the public.[7]  Thus, heightened First Amendment

protections are not warranted.  *See Snyder*, 131 S. Ct. at 1215–16 (citing *Dun & Bradstreet, Inc.*

*v. Greenmoss Builders, Inc.*, 472 U.S. 749, 760 (1985)).  The First Amendment does not serve as

a complete defense.  There was no error in the district court's treatment of the IIED claim, and

we affirm.

V.

Shirvell next contends that the stalking verdict must be reversed.  He claims that

Armstrong failed to prove the *prima facie* elements of stalking and that Shirvell's behavior was

within the realm of protected First Amendment conduct.

In Michigan, the tort of stalking is committed when the defendant engages in "a willful

course of conduct whereby the victim of repeated or continuous harassment actually is, and a

reasonable person would be, caused to feel terrorized, frightened, intimidated, threatened,

harassed, or molested."  *Nastal v. Henderson & Assocs. Investigations, Inc.*, 691 N.W.2d 1

(Mich. 2005) (citing Mich. Comp. Laws § 750.411h(1)(d)); *see also* Mich. Comp. Laws §

600.2954 (providing that a plaintiff "may maintain a civil action against an individual who

engages in conduct that is prohibited under section 411h or 411i of the Michigan penal code").

In turn, "harassment" is defined as: "conduct directed toward a victim that includes, but is not

---

[7] The Michigan Court of Appeals, reviewing Shirvell's claim that he was illegally terminated from his position with the state's Attorney General's office, recently held in *Shirvell v. Department of Attorney General*, __ N.W.2d __, 2015 Mich. App. LEXIS 8 (Mich. Ct. App. Jan. 8, 2015), that the government's interest in the efficient provision of public services outweighed Shirvell's speech interests pursuant to *Pickering v. Bd of Ed. of Twp. High Sch. Dist.*, 391 U.S. 563 (1968).  In reaching this decision, the state court assumed without deciding that Shirvell spoke on a matter of public concern.  *Shirvell*, 2015 Mich. App. LEXIS, at *42–43.  It noted, however, that any public concern was "very limited" and that "the vast majority of the speech was dedicated to discussing the sexual orientation of Armstrong and Armstrong's acquaintances."  *Id.* at 43–44.  The court did not need to decide whether Shirvell's speech was on a matter of public concern because the government's interest would have outweighed his interest in any event.  *See id.* at 42–43, 63–64.  The state court's conclusion is not materially inconsistent with the conclusion we reach here.  Moreover, neither party argues that the state court decision should have preclusive effect. Though we may consider preclusion *sua sponte*, *see MSI Regency, Ltd. v. Jackson*, 433 F. App'x 420, 430 & n.6 (6th Cir. 2011), neither *res judicata* nor collateral estoppel applies here.

limited to, repeated or continuing unconsented contact that would cause a reasonable individual to suffer emotional distress and that actually causes the victim to suffer emotional distress." Mich. Comp. Laws § 750.411h(c). "Unconsented contact" includes, but is not limited to "[f]ollowing or appearing within the sight of that individual . . . [a]pproaching or confronting that individual in a public place or on private property . . . [a]ppearing at that individual's workplace or residence." *Id.* § 750.411h(e).

Shirvell argues that "there was no repeated or continuing unconsented contact to sustain a stalking claim" and implies that the district court should not, therefore, have allowed the stalking claim to reach the jury. We disagree. Shirvell appeared outside Armstrong's home on more than one occasion, followed him to activities on campus, appeared at a student meeting he was attending, repeatedly called his summer employer's office, and followed his friends in search of Armstrong. From this course of conduct, a reasonable jury could certainly find that Shirvell engaged in stalking.

Shirvell claims that—even if the elements of stalking were satisfied—the First Amendment insulates him from liability. He notes that the Michigan statute is subject to the First Amendment, *see* Mich. Comp. Laws § 750.411h(1)(c) ("Harassment does not include constitutionally protected activity or conduct that serves a legitimate purpose."), and that the local prosecutor's office decided not to authorize a stalking charge against Shirvell based on the view that his activity was constitutionally protected. But the prosecutor's assessment is not dispositive and, for present purposes, is not persuasive. The prosecutor explained that "Shirvell's statements, although at times childish and disingenuous, are protected speech as he has a right to criticize the qualifications, campaign promises, or public views of the student body president." As discussed, however, Shirvell's statements went far beyond criticism of

Armstrong's qualifications, campaign promises, and public views; they included many lies about the private life of a private figure. *See Cavanaugh v. Smith*, No. 282147, 2009 WL 1101379 (Mich. Ct. App. 2009) (holding that a personal protection order against stalking was constitutional because the order "only enjoin[ed] respondent from making 'slanderous statements' about petitioner within the community, and slanderous statements are not constitutionally protected" (citing *Van Buren Charter Twp. v. Garter Belt, Inc.*, 673 N.W.2d 111 (Mich. Ct. App. 2003))). Moreover, his behavior went beyond simple speech and protest; he went to Armstrong's home and followed Armstrong and his friends. The conduct relevant to the stalking verdict does not fall within the purview of the First Amendment's protection. The district court was correct to submit the stalking claim to the jury.

VI.

Shirvell urges this court to reverse the district court's decision refusing to remit the compensatory damages award. He also argues that the exemplary damages award is unconstitutional and should be vacated.

A.

This court reviews the district court's denial of remittitur under an abuse-of-discretion standard. *Sykes v. Anderson*, 625 F.3d 294, 322 (6th Cir. 2010). A district court may remit a verdict for compensatory damages only "when, after reviewing all the evidence in the light most favorable to the prevailing party, it is convinced that the verdict is clearly excessive; resulted from passion, bias, or prejudice; or is so excessive or inadequate as to shock the conscience of the court.'" *Id.* (quoting *Am. Trim, LLC v. Oracle Corp.*, 383 F.3d 462, 475 (6th Cir. 2004)). A verdict is excessive only if "'it is beyond the maximum damages that the jury reasonably could find to be compensatory for a party's loss.'" *Id.* (quoting *Am. Trim*, 383 F.3d at 475). A verdict

should not be set aside if there is "*any* credible evidence" to support it. *Id.* (emphasis added) (internal quotation marks omitted).

Shirvell argues that Armstrong has failed to demonstrate any loss whatsoever and that his compensatory damages award should be reduced to a nominal amount of one dollar. There is, however, credible evidence supporting the jury's compensatory damages award here. We have already discussed the evidence supporting the damages award for defamation and have also recommended vacating the damages award on the false light claim to prevent double recovery. All that remains is to ask whether there is any credible evidence supporting the compensatory damages awards for IIED and stalking.

An IIED plaintiff can recover damages for the emotional distress suffered. *Dickerson v. Nichols*, 409 N.W.2d 741, 742 (Mich. Ct. App. 1987). Although a plaintiff may also recover for bodily injury resulting from emotional distress, bodily injury is not a prerequisite to recovery. Here, there is evidence that Armstrong suffered severe distress as a result of Shirvell's conduct. Armstrong testified that he felt frustrated, furious, and low, and believed he was going through a period of depression. He suffered a loss of confidence. Others corroborated Armstrong's testimony about the emotional toll he suffered. Armstrong felt that he would continue to feel the emotional effects of Shirvell's campaign. The jury awarded him $1.75 million in damages for IIED. This is not beyond the maximum amount that a reasonable jury could award Armstrong to compensate for his loss, and we uphold the award.

A stalking victim may recover "damages incurred . . . as a result of that conduct." Mich. Comp. Laws § 600.2954. Armstrong presented evidence of the emotional suffering that he endured as a result of Shirvell's continuing course of harassment. He described one occasion when Shirvell waited outside his house. Armstrong was "nervous about whether or not he was

going to make an approach." When Armstrong needed to leave the house, he called the campus safety office for an escort. When Shirvell arrived outside Armstrong's house on another occasion, Armstrong was "really upset," and he and his friends "were all just very concerned what was going to happen, what . . . this meant for . . . us going forward," and explained that "the fact that [Shirvell] was going to come to a party this late at night and come outside of our house was really concerning." Armstrong felt "very uncomfortable" when Shirvell followed him around campus and was nervous when Shirvell attended a meeting of the student council, at which the University provided security for Armstrong. When Shirvell again appeared outside Armstrong's house, Armstrong and a roommate were both concerned. This testimony demonstrates that Armstrong suffered ongoing fear as a result of Shirvell's stalking. This type of emotional harm was not necessarily the same as the depression, stress, and loss of confidence that he suffered as a result of the conduct constituting IIED. Thus, the jury's award of $100,000 in compensatory damages for stalking was not beyond the maximum that the jury could reasonably find to be compensatory. Remittitur is unwarranted on the compensatory damages award for stalking, and we affirm that portion of the damages verdict.

B.

Shirvell also challenges the exemplary damages awards for both stalking and defamation.[8] Again, Shirvell did not waive these arguments entirely, as he did not invite the district court's alleged errors, but he also failed to specifically object to the court's treatment of

---

[8] Armstrong meets the basic state law requirements for recovery of exemplary and punitive damages. *See* Mich. Comp. Laws § 600.2911(2)(b); *Peisner v. Detroit Free Press, Inc.*, 364 N.W.2d 600, 606 (Mich. 1984). He requested a retraction and gave Shirvell a reasonable time to retract his statements. As discussed, Armstrong also demonstrated that Shirvell acted with actual malice.

the exemplary damages awards at trial.[9]  We therefore review for plain error.  *See Reynolds*, 184 F.3d at 594.  We hold that neither the district court's handling of the exemplary damages for defamation nor its instructions on the exemplary damages for stalking constitute plain error.

In Michigan, exemplary damages are "a species of 'actual' (*i.e.*, compensatory) damages awarded to compensate plaintiff for the increased injury to feelings directly attributable to defendant's *fault*."  *Peisner*, 364 N.W.2d at 603.  Punitive damages—which punish the defendant—are available only when the legislature has expressly authorized them.  *Gilbert v. DaimlerChrysler Corp.*, 685 N.W.2d 391, 400 (Mich. 2004).  The legislature has expressly authorized punitive damages for defamation, Mich. Comp. Laws §§ 600.2911(2)(b), but has not done so in the case of stalking.  *See id.* § 600.2954 (authorizing exemplary damages for stalking, but not punitive damages).  The district court did not explicitly instruct the jury that it could award punitive damages on any claim, and no punitive damages line appears on the verdict form.

The district court's jury instructions with regard to damages are not an example of clarity. The court first discussed exemplary damages in the context of the defamation claim and arguably defined them correctly.  Then the district court began to discuss exemplary damages in the context of the stalking claim and gave a muddled instruction that used the words "punish" and "punitive" and mixed concepts of punitive and exemplary damages.  The verdict form contained a line only for the possible award of exemplary damages and, as we have noted, did not mention punitive damages.

There is additional ambiguity in the jury instructions.  Read differently, the defamation instruction was not correct either.  Even though we interpret the use of the word "punish" to

---

[9] As discussed, after the parties each filed proposed instructions and objected to each other's proposals, they acquiesced to some extent in the district court's plan to use the Michigan's Model Civil Jury Instructions.  *See supra* n.6.  Here, Shirvell did not invite the error because the district court confused punitive and exemplary damages in a manner inconsistent with the Michigan Model Civil Jury Instructions.  Hence, even though Shirvell did not specifically object to the offending instruction, he also did not affirmatively waive his objection.

apply to the stalking instruction that begins immediately after it, others could read that paragraph as a transitional one that applies to exemplary damages for both defamation and stalking.

Whatever interpretation is given to the jury instructions, the jury instructions relating to exemplary damages are erroneous because they mix two forms of damages, one of which was not before the jury. We decline to reverse, however, concluding that they do not rise to the level of plain error. Our power to review a claim based on plain error "is discretionary and should be exercised only in those situations in which the failure to do so would result in a manifest miscarriage of justice." *Finch v. Monumental Life Ins. Co.*, 820 F.2d 1426, 1432 (6th Cir. 1987) (internal quotation marks omitted). Plain error requires "an obvious and prejudicial error." *See Reynolds*, 184 F.3d at 594 (internal quotation marks omitted). The burden is on the party claiming error to demonstrate that the error is so severe that he would have prevailed had the error not occurred. *See Puckett v. United States*, 556 U.S. 129, 135 (2009) ("[The appellant] must demonstrate that the error 'affected the outcome of the district court proceedings.'" (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)); *Mesman v. Crane Pro Servs.*, 512 F.3d 352, 357 (7th Cir. 2008) (explaining that the error must have been "so strong that we can say that had it not been for an erroneous instruction [they] would surely have prevailed at trial"). In exercising our discretion, we also consider "the costs of correcting an error." *Alsobrook v. UPS Ground Freight, Inc.*, 352 F. App'x 1, 3 (6th Cir. 2009) (quoting Fed. R. Civ. P. 51 advisory committee's note (2003)).

Here, it is unclear what effect, if any, the district court's error had on the jury's verdict. The court had given a correct definition of exemplary damages immediately before the errors in the instructions occurred, whether or not the erroneous language was intended to apply to stalking only or to both stalking and defamation. The stalking verdicts—both of compensatory

and exemplary damages—were relatively modest compared with the jury's verdicts on other claims. And the court never instructed the jury specifically that punitive damages were an option on any claim.

And importantly, the costs of correcting the district court's error with respect to the stalking verdict are relevant. Here, the costs of correcting the error would be extreme. When we reverse based on district-court error, we "must consider whether 'it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice.'" *Yehia v. Rouge Steel Corp.*, 898 F.2d 1178, 1184 (6th Cir. 1990) (quoting *Gasoline Prods. v. Champlin Refinin Co.*, 283 U.S. 494, 500 (1931)). The exemplary damages issue in this case is intertwined with the compensatory damages issue. Exemplary damages compensate the plaintiff for the increased injury to his feelings due to the defendant's fault. *Peisner*, 364 N.W.2d at 603. The new jury would therefore need to distinguish between the injuries included in the compensatory damages from the *increased* injuries to be provided as exemplary damages. The issues of exemplary and compensatory damages—along with the issue of Shirvell's fault for the stalking—are not distinct and separable. A new trial would need to encompass all of them. A significant amount of evidence would have to be presented to demonstrate the circumstances of the stalking and the damages that Armstrong sustained as a result. Indeed, it would be impossible to present the evidence of stalking in a vacuum. Essentially, the whole case would be retried. This would entail significant costs for the parties, the court, and others involved in the process. Moreover, our disposition of this matter does not result in any injustice to either party that we can discern—and certainly not a manifest one.

Accordingly, we decline to reverse for plain error and affirm the exemplary damages award for stalking.

With respect to the exemplary damages for defamation, Shirvell again failed to object, so plain error review applies. In this context, there was no plain error because punitive damages are available for defamation. Thus, to the extent that the jury might have included some amount intended to punish within its $500,000 award of "exemplary" damages for defamation, this was permissible. Even if read to contain error in the defamation instruction, the instructions are unlikely to have led to a substantive problem with the damages award. Thus, the error was not prejudicial. *See Reynolds*, 184 F.3d at 594. Moreover, the same concerns about costs that exist with a retrial of the stalking damages apply equally to the defamation claim.

Shirvell argues, however, that any punitive element to the $500,000 "exemplary" damages award for defamation is excessive, and thus unconstitutional.[10] He argues that the district court should have remitted the exemplary damages award for this reason. A punitive damages award violates the Due Process Clause of the Fourteenth Amendment if it is "grossly excessive" in relation to the state's interests in punishment and deterrence. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568 (1996). Three factors are relevant in determining whether punitive damages are excessive: "'(1) the degree of reprehensibility of the conduct; (2) the disparity between the harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages and the civil penalty imposed in comparable cases.'" *Sykes v. Anderson*, 625 F.3d 294, 322–23 (6th Cir. 2010) (quoting *Gibson v. Moskowitz*, 523 F.3d 657, 664 (6th Cir. 2008)).

Even assuming that the jury awarded the entire $500,000 "exemplary" damages award as a punitive sum, the award here was not excessive. "Perhaps the most important indicium of the

---

[10] Shirvell's argument about the constitutionality of the exemplary damages applies equally to the exemplary damages awarded for stalking, to the extent that those included any punitive element. However, we do not consider those here because we have already held that the suggestion of a punitive element in the stalking context constituted error, albeit not plain error. Even if we were to consider the constitutionality of the stalking damages in this section, we would hold that they were not excessive.

reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *BMW*, 517 U.S. at 575. Shirvell's conduct here was highly reprehensible. It involved an ongoing pattern of intentional misconduct. While Shirvell claimed that his conduct was political in nature, it was in fact highly personal. It was instigated by, and largely focused on, Armstrong's sexual orientation. Although Shirvell claimed that his only goal was to persuade Armstrong to resign his position, Shirvell's conduct was grossly excessive, reaching far beyond Armstrong's leadership and agenda and striking at the core of his personal life. It resulted in— and was calculated to result in—distress and intimidation, not just for Armstrong, but also for his family and friends.

Next, there was a "reasonable relationship" between the actual and punitive damages. *See BMW*, 517 U.S. at 581. As discussed, Armstrong suffered significant harm. He was awarded $750,000 in compensatory damages for defamation, 150% of the punitive damages award. *See id.* ("[E]ven though a punitive damages award of 'more than 4 times the amount of compensatory damages' might be 'close to the line,' it did not 'cross the line into the area of constitutional impropriety.'" (quoting *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23–24 (1991)). This court has previously affirmed punitive damages totaling more than the actual damages in a defamation case. *See Glennon v. Dean Witter Reynolds, Inc.*, 83 F.3d 132 (6th Cir. 1996) (affirming a punitive award of $750,000 and $728,250 in compensatory damages because an arbitration panel afforded meaningful review of those awards).

*Glennon* also demonstrates that the punitive damages award in this case was not excessive in relation to awards in similar cases. The defendant in that case, a securities dealer and the plaintiff's former employer, falsely stated that the plaintiff, a former branch manager, was "under internal review for fraud or wrongful taking of property, or violating investment-

related statutes, regulations, rules or industry standards of conduct." *Id.* at 135. Shirvell's conduct in this case was at least as reprehensible as the employer's conduct in *Glennon*. Shirvell falsely accused Armstrong of committing serious crimes, and harmed his reputation in ways that would affect his social life and his career prospects.

The application of the three *BMW* factors indicates that the award of exemplary damages, even if it contained punitive elements, was not constitutionally suspect. We therefore affirm the award.

VII.

Shirvell next appeals the district court's denial of his motion for a new trial. We review a district court's refusal to grant a motion for a new trial for abuse of discretion. *Tompkins v. Crown Corr, Inc.*, 726 F.3d 830, 835 (6th Cir. 2013). This court "'will find an abuse of discretion only when the Court has a definite and firm conviction that the trial court committed a clear error of judgment.'" *Id.* (quoting *Mike's Train House, Inc. v. Lionel, LLC*, 472 F.3d 398, 405 (6th Cir. 2006)). Shirvell lists a litany of claims for a new trial, none of which has merit.

He first claims that Armstrong failed to plead defamation with specificity, as required under Michigan law. But the pleading rules in a removed diversity case are governed by federal pleading standards. *See* Fed.. R. Civ. P. 81(c)(1); *Granny Goose Foods, Inc. v. Bhd. of Teamsters and Auto Truck Drivers*, 415 U.S. 423, 438 (1974). As discussed, those do not require pleading the defamatory statements with specificity.

Shirvell next contends that a new trial is required because Armstrong's arguments on defamation were barred by judicial estoppel. Shirvell claims that Armstrong defended his complaint, stating that "his Complaint very specifically sets forth, many times in quotes, the precise (roughly three dozen) defamatory statements at issue in the case." The district court

denied Shirvell's motion for a more definite statement. Shirvell argues that judicial estoppel therefore prevented Armstrong from introducing additional defamatory statements. This argument lacks merit. Armstrong did not prevail on the motion for a more definite statement by relying on the argument that he would not present evidence of any further defamatory statements. *See United States v. Turner*, 602 F.3d 778, 783 (6th Cir. 2010). Rather, the district court denied the motion for a more definite statement "on the basis that the complaint [was] adequate to give [Shirvell] notice." The district court clearly believed that Shirvell had sufficient information of the conduct that gave rise to the defamation claim. Armstrong was not estopped from presenting to the jury statements that were from the same sources as—and substantially the same as—the statements provided in the complaint.

Next, Shirvell alleges that the district court failed to filter the statements that were capable of defamatory meaning and those that were not. We have already concluded that any error in this regard was harmless.

Shirvell next contends that the district court denied him the opportunity to use the First Amendment as a defense by preventing him from mentioning the First Amendment in his closing argument. He does not explain why this was error. Even assuming that it was error, Shirvell suffered no prejudice. The First Amendment "defenses" on which Armstrong relied—such as whether Armstrong was a public figure, whether the statements were capable of defamatory meaning, and whether the First Amendment insulated Shirvell from liability for stalking—were all questions of law. Where the jury did have to decide a First Amendment-related issue, such as whether Shirvell acted with actual malice, the district court properly instructed the jury on that concept, without needing to explain the constitutional origins of that issue. Discussing the First Amendment during closing would not have given Shirvell any additional benefit.

Shirvell finally points to a "plethora" of other trial errors, which—though they "may not have resulted in an unfair trial" standing alone—caused overwhelming prejudice in combination. He provides no legal analysis to support these claims of error, and no explanation of why these errors caused prejudice in isolation or combination. He has therefore waived these arguments. *See Arch on the Green, Inc. v. Groves*, 761 F.3d 594, 602 (6th Cir. 2014) ("'It is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'" (alteration omitted) (quoting *United States v. Johnson*, 440 F.3d 832, 846 (6th Cir. 2006))).

Shirvell's arguments present no basis for a new trial.

VIII.

For the foregoing reasons, we affirm in part, but reverse the district court's award of compensatory damages for false light invasion of privacy. We vacate the district court's judgment and remand with instructions to enter judgment in Armstrong's favor for a total of $3.5 million.